# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

Carl T. Sr.,
**Petitioner Below, Petitioner**

**FILED**

**June 3, 2016**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs) No. 15-0649** (Mercer County 13-C-230)

**David Ballard, Warden,**
**Mount Olive Correctional Complex,**
**Respondent Below, Respondent**


## MEMORANDUM DECISION

Petitioner Carl T. Sr.,[1] by counsel Paul R. Cassell, appeals the order of the Circuit Court of Jackson County, entered on June 2, 2015, denying his petition for a writ of habeas corpus. David Ballard, Warden, Mount Olive Correctional Complex, by counsel Lara Kay Omps-Botteicher, filed a response, and petitioner filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On October 12, 2006, petitioner was indicted on thirteen counts, as follows: one count of sexual assault in the second degree and one count of sexual abuse by a guardian with regard to his son's girlfriend; three counts of sexual assault in the first degree, three counts of sexual abuse by a guardian, and three counts of incest with regard to his stepdaughter/niece; and one count of sexual abuse in the first degree and one count of sexual abuse by a guardian with regard to his stepson/

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W.Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W.Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990).

1

nephew.[2] According to the indictment, all the offenses were committed from November of 2001 to February 20, 2006.

At a April 20, 2007, plea hearing, petitioner entered a "best interest plea"[3] to six counts of the indictment and the State dismissed the other seven counts in accordance with a binding plea agreement pursuant to Rule 11(e)(1)(C) of the West Virginia Rules of Criminal Procedure. To support petitioner's guilty pleas, the State proffered what the evidence would have shown had the case proceeded to trial. Thereafter, the circuit court accepted petitioner's guilty pleas, and ordered a presentence investigation report and a sex offender evaluation. On June 7, 2007, Dr. Ralph S. Smith Jr. reported that "a treatment plan cannot be developed or recommended" because "[petitioner] denied committing any of the criminal sexual acts[.]" Subsequently, on June 27, 2007, the circuit court sentenced petitioner consistent with the binding plea agreement[4] and imposed an aggregate term of twenty-five to fifty-five years of incarceration.[5] Petitioner did not appeal his convictions or sentence.

On June 10, 2013, petitioner filed a petition for a writ of habeas corpus. Petitioner was appointed counsel who filed an amended petition on August 5, 2014, alleging the following grounds for relief: (1) ineffective assistance of trial counsel; (2) involuntary guilty pleas; (3) disproportionate sentence; and (4) insufficient indictment. The circuit court held an omnibus habeas corpus hearing on August 13, 2014, at which both petitioner and his trial counsel testified. Thereafter, on June 2, 2015, the circuit court entered a comprehensive 125-page order which rejected petitioner's claims and denied his habeas petition.

Petitioner now appeals the circuit court's June 2, 2015, order denying his habeas petition. We apply the following standard of review in habeas appeals:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review

---

[2]At the time of the reporting of the incidents, the victims were fourteen, thirteen, and twelve years old, respectively.

[3]We have found that "best interest plea" is a local term of art used in Mercer County for a plea entered pursuant to Syllabus Point 1 of *Kennedy v. Frazier*, 178 W.Va. 10, 357 S.E.2d 43 (1987), in which we held that a defendant who does not admit guilt may enter a guilty plea if he determines that it is in his best interest to do so. *State v. Shrader*, 234 W.Va. 381, 384 n.5, 765 S.E.2d 270, 273 n.5 (2014).

[4]The plea agreement gave the circuit court a certain amount of discretion whether to impose concurrent or consecutive sentences.

[5]At certain places in its June 2, 2015, order denying petitioner's habeas petition, the circuit court states petitioner's aggregate sentence as twenty-five to sixty years of incarceration. However, that is an error.

the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

We find that the circuit court's order adequately resolves all issues raised by petitioner in his habeas petition. However, we briefly address petitioner's allegations of a disproportionate sentence and an insufficient indictment to the extent that petitioner contends that the circuit court either refused to consider or misconstrued certain of his arguments. First, petitioner asserts that the circuit court erred in refusing to consider his argument that his aggregate sentence was disproportionate to his crimes in reliance on *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982). In Syllabus Point 4 of *Goodnight*, we held that "[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." 169 W.Va. at 366, 287 S.E.2d at 505. Petitioner notes that in *State v. David D.W.*, 214 W.Va. 167, 588 S.E.2d 156 (2003), and *State v. Richardson*, 214 W.Va. 410, 589 S.E.2d 552 (2003), we deviated from the law established in *Goodnight* to find that sentences within statutory limits could be unconstitutional pursuant to a disproportionality analysis.

"While our constitutional proportionality standards theoretically can apply to any criminal sentence, they are basically applicable to those sentences where there is either no fixed maximum set by statute or where there is a life recidivist sentence." Syl. Pt. 4, *Wanstreet v. Bordenkircher*, 166 W.Va. 523, 276 S.E.2d 205 (1981). Accordingly, in *State v. Slater*, 222 W.Va. 499, 507-08 and n.11 665 S.E.2d 674, 682-83 and n.11 (2008), we disapproved of *David D.W. and Richardson* because each "[was] a deviation from our established law." In disapproving of those decisions, we noted that each was a per curiam opinion which, during their usage,[6] were not meant to change established law. *Id.*; *see* Syl. Pt. 2, *Walker v. Doe*, 210 W.Va. 490, 558 S.E.2d 290 (2001) (holding that signed opinions will be used to announce new points of law). Therefore, as petitioner's case involves neither a life recidivist sentence nor a statute with no fixed maximum sentence, we conclude that the circuit court did not err in refusing to consider his disproportionality argument.

Second, petitioner contends that the circuit court erred in concluding that the indictment was sufficient, in part, by finding that his double jeopardy concerns were addressed by the fact that "[a] conviction under an indictment charged, though the proof was at variance regarding immaterial dates, precludes a subsequent indictment on the exact same material facts contained in the original indictment." *State ex rel. State v. Reed*, 204 W.Va. 520, 524, 514 S.E.2d 171, 175 (1999) (citing *State v. Sears*, 196 W.Va. 71, 468 S.E.2d 324 (1996)). Petitioner states that his objection is not to the indictment's use of approximate dates, but that its paucity of factual allegations would prevent him from determining whether the same material facts were contained in a subsequent indictment. Respondent counters that each count of the indictment was sufficiently

---

[6]In *State v. McKinley*, 234 W.Va. 143, 148, 764 S.E.2d 303, 308 (2014), we discontinued the use of per curiam opinions.

3

specific as to the victim involved, and the approximate time and place, to permit petitioner to invoke the double jeopardy bar to a subsequent prosecution. Upon our own review of the indictment,[7] we agree with respondent. We note that pursuant to Syllabus Point 2 of *Sears*, a defendant needs only to present a prima facie case in order to invoke double jeopardy because "[o]nce the defendant proffers proof to support a non[-]frivolous claim, the burden shifts to the State to show by a preponderance of the evidence that double jeopardy principles do not bar the imposition of [a second] prosecution[.]" 196 W.Va. at 73, 468 S.E.2d at 326. We conclude that the indictment in this case would allow petitioner to invoke the double jeopardy bar and that the circuit court did not err in finding that the indictment was sufficient.

Having reviewed the circuit court's June 2, 2015, "Order Denying The Petitioner's Petition for Writ of Habeas Corpus Ad Subjiciendum And Removing It From The Court's Active Docket," we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to all other issues raised by petitioner in this appeal. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.[8] We conclude that the circuit court did not abuse its discretion in denying petitioner's petition for a writ of habeas corpus.

Affirmed.

**ISSUED**: June 3, 2016

**CONCURRED IN BY**:

Chief Justice Menis E. Ketchum
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Allen H. Loughry II

---

[7]The sufficiency of an indictment is reviewed de novo. Syl. Pt. 2, in part, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996).

[8]Certain names in the circuit court's order have been redacted. *See* fn.1, *supra*.

4

15-0649

NOTED CIVIL DOCKET

JUN 02 2015

JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

## IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA.

STATE OF WEST VIRGINIA, *ex rel,*
CARL ███████ T█████████████          PETITIONER,

v.          Civil Action No. 13-C-230-DS

DAVID BALLARD, WARDEN
MT. OLIVE CORRECTIONAL CENTER,          RESPONDENT.

## ORDER DENYING THE PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM AND REMOVING IT FROM THE COURT'S ACTIVE DOCKET

On August 13, and October 15, 2014, this matter came before the Court, the Honorable Derek C. Swope presiding, for a hearing on the Petitioner's Petitions for Writ of Habeas Corpus Relief, brought pursuant to the provisions of Chapter 53, Article 4A of the West Virginia Code, as amended, which were filed by the Petitioner, *pro se,* and also by and through his court-appointed counsel, Paul R. Cassell, Esq. The Petitioner filed a *pro se* Petition for Writ of Habeas Corpus on June 10, 2013. Counsel for the Petitioner filed an Amended Petition for Writ of Habeas Corpus on August 5, 2014. The State filed its Response on August 5, 2014. The Petitioner and his counsel appeared for the omnibus hearing. John McGinnis, IV, Esq., Assistant Prosecuting Attorney, appeared on behalf of the State of West Virginia. On October 14, 2014, the State filed its Response to the Amended Petition for Writ of Habeas Corpus.

The Petitioner is seeking post-conviction habeas corpus relief from his June 27, 2007, sentences of not less than ten (10) nor more than twenty-five (25) years for the offense of Sexual Assault – Second Degree, not less than one (1) nor more than five (5) years for the offense of Sexual Abuse – First Degree, not less than fifteen (15) nor more than thirty-five (35) years for

1

the offense of Sexual Assault – First Degree, not less than ten (10) nor more than twenty (20) years on each of two counts of Sexual Abuse by a Custodian, and not less than five (5) nor more than fifteen (15) years for the offense of Incest, as more specifically set out, *infra*, absent a showing that he is being unlawfully detained due to prejudicial Constitutional errors in the underlying criminal proceedings.

Whereupon, the Court, having reviewed and considered the Petition, the court files, the transcripts, the argument of counsel and the pertinent legal authority, does hereby **DENY** the Petitioner's Petition for Writ of Habeas Corpus Relief.

In support of the aforementioned ruling, the Court makes the following General Findings of Fact and Conclusions of Law:

## I.     FACTUAL/PROCEDURAL HISTORY: CASE NO. 06-F-400

### A.  The Indictment

By a True Bill returned on October 12, 2006 by the Mercer County Grand Jury, the Petitioner, Carl ███ T███████, was indicted for the offenses of Sexual Assault – Second Degree (1 Count); Sexual Abuse by a Custodian (5 Counts); Sexual Abuse – First Degree (1 Count); Sexual Assault – First Degree (3 Counts); and Incest (3 Counts) .

### B.  Pre-Trial Proceedings

The Petitioner was arraigned on these charges on November 21, 2006. There were no pre-indictment proceedings. The Mercer County Public Defender's Office was appointed to represent the Petitioner. This matter was assigned to the Honorable John R. Frazier. The Court set a $20,000.00 surety bond with a condition of home confinement. The matter was set for trial on February 6, 2007.

2

Elizabeth French, Esq., was assigned as counsel. She filed a Motion for Discovery on behalf of the Petitioner on November 29, 2006. The State filed its reciprocal discovery motion on December 1, 2006. The Petitioner was bonded out and placed on home confinement in McDowell County on November 29, 2006. On January 11, 2007, trial counsel moved to continue the trial. This motion was granted and the trial was continued until April 4, 2007. Jerome McFadden, Esq., was appointed as co-counsel with Ms. French. On January 25, 2007, Ms. French filed a "Motion for Determination of Competency and/or Criminal Responsibility" pursuant to W. Va. Code §27-6A-1. This motion was granted on January 29, 2007.

Ms. French filed the Petitioner's witness list on March 28, 2007. She listed sixteen (16) witnesses. By this time, the matter had been reassigned to Senior Status Judge David W. Knight. He granted a defense request for the Grand Jury transcript. Multiple subpoena requests were filed by the Petitioner's trial counsel. The State obtained a HIPAA order to get the victim, I██████ S██████'s treatment records, from Phyllis Hasty, play therapist. This order was entered on April 12, 2007.

## C. The Plea Agreement

The Petitioner and his trial counsel, Elizabeth French, Esq., and Jerome J. McFadden, Esq., appeared before Judge Knight on April 20, 2007, at which time the Petitioner entered a guilty plea to six (6) of the thirteen (13) counts in the indictment. The plea agreement provided that the Petitioner would enter a best interest guilty plea to one count of Sexual Assault – Second Degree, punishable by ten (10) to twenty-five (25) years in the penitentiary; one count of Sexual Abuse – First Degree punishable by one (1) to five (5) years in the penitentiary; two counts of Sexual Abuse by a Custodian, each

3

punishable by ten (10) to twenty-five (25) years in the penitentiary; one count of Sexual

Assault – First Degree, punishable by fifteen (15) to thirty-five (35) years in the

penitentiary; and one count of Incest, punishable by five (5) to fifteen (15) years in the

penitentiary. The other charges would be dismissed.

The agreement also provided that:

> "As to sentencing, the State and the Defendant agree that a specific sentence, in part, is the appropriate disposition of the case. Pursuant to Rule 11(e)(1)(C) of the West Virginia Rules of Criminal Procedure, the State and the Defendant agree that the three sexual abuse/assault counts (Counts 1, 3, and 5) run concurrent with one another and that the two counts of sexual abuse by a custodian (Counts 4 and 6) run concurrent with one another. Otherwise, the State further agrees to remain silent. The Court retains authority to decide whether the three sets of charges (sexual abuse/assault; abuse by a custodian; incest) run concurrent (same time) or consecutive (one after the other) to one another.
> Defendant acknowledges the fact that even under the Rule 11(e) portion of this plea, he may be sentenced to an indeterminate term of confinement in penitentiary for a term of not less than fifteen years nor more than thirty-five years on the sexual abuse/assault charge set (15-35 years). Defendant also acknowledges the fact that he may be sentenced to an indeterminate term of confinement in penitentiary for a term of not less than ten years nor more than twenty years on the sexual abuse by a custodian charge set (10-20 years). Defendant acknowledges that he may be sentenced to an indeterminate term of not less than five nor more than fifteen years on the incest charge (5-15 years). Defendant acknowledges that the Court maintains discretion to run the three sets of charges concurrent or consecutive to one another. Further, the defendant agrees that an unpleasant or unanticipated sentence does not give the defendant the right to withdraw from this Agreement."

The effect of this agreement was to expose the Petitioner to a maximum sentence of

forty-six (46) to one hundred and fifteen (115) years. Absent the agreement, he faced

exposure to a maximum sentence of one hundred and twenty-one (121) to two hundred

and eighty (280) years.

4

## D. Sentencing

The Petitioner was sentenced as follows:

Whereupon, the Court inquired of the defendant if anything for himself he had or knew to say why the Court here should not now proceed to pronounce judgment against him, and nothing being offered or alleged in delay of judgment, it is the **ORDER** and **DECREE** of this Court that the said Carl████ T██████ be and is hereby adjudged guilty of the offenses of "Sexual Assault – Second Degree," as the State in Count 1 of its Indictment herein hath alleged and by his plea he hath admitted, "Sexual Abuse – First Degree" as the State in Count 3 of its indictment herein hath alleged and by his plea he hath admitted, "Sexual Abuse by a Custodian" as the State in Counts 4 and 6 of its indictment herein hath alleged, "Sexual Assault – First Degree" as the State in Count 5 of its indictment herein hath alleged and by his plea he hath admitted and "Incest" as the State in Count 7 of its indictment herein hath alleged and as by his plea he hath admitted; that he be taken from the bar of this Court to the Southern Regional Jail and therein confined until such time as the warden of the penitentiary can conveniently send a guard for him and that he be taken from the Southern Regional Jail to the penitentiary of this State and therein confined for the indeterminate terms of not less than ten (10) nor more than twenty-five (25) years as provided by law for the offense of "Sexual Assault – Second Degree" as the State in Count 1 of its Indictment herein hath alleged and by his plea he hath admitted; not less than one (1) nor more than five (5) years as provided by law for the offense of "Sexual Abuse – First Degree" as the State in Count 3 of its indictment herein hath alleged and by his plea he hath admitted; not less than fifteen (15) nor more than thirty-five (35) years as provided by law for the offense of "Sexual Assault – First Degree" as the State in Count 5 of its indictment herein hath alleged and as by his plea he hath admitted; not less than ten (10) nor more than twenty (20) years each as provided by law for each offense of "Sexual Abuse by a Custodian" as the State in Counts 4 and 6 of its indictment herein hath alleged and as by his plea he hath admitted; and not less than five (5) nor more than fifteen (15) years as provided by law for the offense of "Incest" as the State in Count 7 of its indictment herein hath alleged and as by his plea he hath admitted; that the defendant be given credit for 13 days on said sentence; and that he be dealt with in accordance with the rules and regulations of that institution and the laws of the State of West Virginia. It is the further **ORDER** and **DECREE** of this Court that the defendant's sentences imposed as to Counts 1, 3 and 5 shall run concurrently with one another and that the defendant's

5

sentences imposed as to Count 4, 6 and 7 shall run concurrently with one another, but that the defendant's sentences imposed as to Count 1, 3 and 5 shall run consecutively with Counts 4, 6 and 7.

The practical effect of these sentences exposed the Petitioner to incarceration for twenty-five (25) to sixty (60) years, or slightly more than twenty percent (20%) of what he could have faced had he been tried and convicted on all charges in the indictments, and roughly half of his maximum exposure under the plea.

### E. Post Plea Proceedings

Subsequent to his sentencing, the Petitioner filed two motions for reconsideration, each of which was denied. He also requested his docket sheet, indictment, plea agreement, commitment and transcripts.

## II. THE PETITIONER'S *PRO SE* PETITION UNDER W. VA. CODE §53-4A-1 FOR WRIT OF HABEAS CORPUS; THE PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM IN SUPPORT OF AMENDED PETITION FOR WRIT OF HABEAS CORPUS; THE *LOSH* CHECKLIST; THE RESPONDENT'S ANSWER; THE OMNIBUS HEARING

### A. The *Pro Se* Petition: Civil Action No. 13-C-230-DS

On June 10, 2013, the Petitioner filed a *pro se* "Petition Under W. Va. Code §53-4A-1 for Writ of Habeas Corpus." In it, the Petitioner asserted that he was denied the effective assistance of counsel, that he was denied a preliminary hearing, that he was never mirandized at the time of his arrest, and that he was not presented with the indictment showing his specific charges. The Court appointed Paul R. Cassell, Esq. to represent the Petitioner in this proceeding.

6

**B. The Amended Petition for Writ of Habeas Corpus and Memorandum in Support of Amended Petition for Writ of Habeas Corpus**

On August 5, 2014, the Petitioner, by counsel, filed an Amended Petition for Writ of Habeas Corpus. It raised the following grounds:

1. Petitioner's Federal And State Constitutional Rights Were Violated By Trial Counsel's Ineffective Assistance:

   (a) Trial counsel was ineffective with regard to the Petitioner's defense to the charges;

   (b) Trial counsel was ineffective with regard to recommending that Petitioner accept a highly unfavorable best interest plea;

   (c) Trial counsel was ineffective in failing to secure the results of DNA evidence and Petitioner's Constitutional Rights are violated by the State's loss of that evidence;

   (d) Trial counsel was ineffective with regard to Mr. T████'s mental state.

2. The guilty plea was not knowingly, intelligently and voluntarily made.

3. Petitioner's State and Federal Constitutional Rights were violated by his disproportionate sentence.

4. Petitioner's State and Federal Constitutional Rights were violated by the inadequate indictment.

5. Petitioner also asserts all additional grounds raised in his *Losh* checklist.

**C. THE *LOSH* CHECKLIST**

Counsel also filed the *Losh* checklist on August 5, 2014 with grounds as follows:

**Waived Grounds:**

In his *Losh* checklist the Petitioner waived the following grounds for relief:

7

- Trial court lacked jurisdiction

- Statute under which conviction was obtained was unconstitutional

- Indictment shows on face no offense was committed

- Prejudicial pretrial publicity

- Denial of right to speedy trial

- Incapacity to stand trial due to drug use

- Language barrier to understanding the proceeding

- Denial of counsel

- Coerced confessions

- Suppression of helpful evidence by prosecutor

- State's knowing use of perjured testimony

- Falsification of a transcript by prosecutor

- Information in pre-sentence report erroneous

- Double jeopardy

- Irregularities in arrest

- Excessiveness or denial of bail

- No preliminary hearing

- Illegal detention prior to arraignment

- Irregularities or errors in arraignment

- Challenges to the composition of grand jury or its procedures

- Failure to provide copy of indictment to defendant

- Defects in indictment

- Improper venue

8

- Pre-indictment delay

- Refusal of continuance

- Prejudicial joinder of defendants

- Lack of full public hearing

- Nondisclosure of Grand Jury minutes

- Refusal to turn over witness notes after witness has testified

- Claims concerning use of informers to convict

- Constitutional errors in evidentiary rulings

- Instructions to the jury

- Claims of prejudicial statements by prosecutor

- Acquittal of co-defendant on same charge

- Defendant's absence from part of the proceedings

- Improper communications between prosecutor or witnesses and jury

## Asserted Grounds:

The Petitioner asserted the following *Losh* grounds:

- Involuntary guilty plea

- Mental competency at time of crime

- Mental competency at time of trial

- Failure of counsel to take an appeal

- Unfulfilled plea bargains

- Ineffective assistance of counsel

- Refusal to subpoena witnesses

- Claim of incompetence at time of offense, as opposed to time of trial

9

- Claims of prejudicial statement by trial judges

- Question of actual guilt upon an acceptable guilty plea

- Severer sentence than expected

- Excessive sentence

- Mistaken advice of counsel as to parole or probation eligibility

- Amount of time served on sentence, credit for time served

## D. THE STATE'S RESPONSE TO THE AMENDED PETITION AND MEMORANDUM IN SUPPORT THEREOF

On October 14, 2014, the Respondent, by and through John H. McGinnis, IV, Esq., Assistant Prosecuting Attorney, filed a Response addressing the Petitioner's Petitions for Writ of Habeas Corpus. This pleading specifically answered most of the allegations raised by the Petitioner, and is set out below.

## E. THE OMNIBUS HABEAS CORPUS HEARING

The omnibus habeas corpus hearing was held on August 13, 2014. Paul R. Cassell, Esq., represented the Petitioner, who appeared in person. The State of West Virginia was represented by John H. McGinnis, IV, Esq., Assistant Prosecuting Attorney.

The Court reviewed both habeas corpus procedure and the finality of the proceeding with the Petitioner. The Court then reviewed the *Losh* checklist to ensure that every ground asserted by the Petitioner was addressed in this proceeding and to further ensure again that the Petitioner understood its finality.

The Petitioner called Elizabeth French, Esq., as his first witness. Ms. French served as co-counsel for the Petitioner at the trial stage. She was assisted by Jerome J. McFadden, Esq., who had no substantial involvement in the case. Ms. French was the primary counsel for the Petitioner.

10

Ms. French testified that she had the Petitioner evaluated and he was found to be both competent and criminally responsible. She was aware that he claimed to have blackouts and asked Dr. Smith, the reviewing psychiatrist, to take that into consideration. This blackout history preceded his criminal charges. She does not know whether he was drawing a disability based on his mental status. During his sentencing the Petitioner laid his head down on the table, perhaps undergoing a blackout. Ms. French did not have the case continued and she wasn't sure at the time of sentencing if he had actually experienced a blackout or wanted to delay the proceedings.

Ms. French knew that there were three alleged victims in this crime, two of whom were both the Petitioner's stepchildren and his niece and nephew. The third victim was not related to the Petitioner. There were multiple charges in the indictment. She was asked if she was surprised to learn that one of the victims, J███ T., claimed that nothing ever happened to him. She stated that would not surprise her, as recantations often occur. When asked if she would be surprised to know that no one from the State ever talked to J███ she testified that would be odd.

Trial counsel recalled that the Petitioner entered a best interest plea with an 11(e)1(c)disposition. There was an agreement as to concurrency for some of the charges. Ms. French testified that she explained the meaning of a best interest plea to the Petitioner and that he understood it. She stated that she filled out the plea bargain paperwork with the Petitioner. She followed her standard procedure, which is to go over the paperwork, read each question out loud, and write down the client's response. She goes over the first sheet, the actual plea of guilty, with the client first, then asks the client to complete the questionnaire to support the petition in her office so that she can

11

promptly answer any questions. She would have written the answers for the Petitioner on the plea of guilty and the Petitioner would have completed the statement in support of guilty plea. In this case she believes she wrote down the answers to all the questions on all the forms and had the Petitioner initial them. He stated that at the time of completing these papers he was being treated for depression, blacking out and losing memory. He stated that he was pleading guilty because his lawyer said it would be in his best interest. She absolutely recommended that the Petitioner take the plea. The Petitioner asserted his innocence throughout the proceeding, but continued to enter the best interest plea. He originally stated that he was not satisfied with his attorney, but changed that answer to affirmative. He also originally stated that she failed to do something that he wanted her to do, but changed his answer on that. At first he had questions about the proceeding, but then changed his mind.

Ms. French did not hire a private investigator, but personally interviewed the witnesses by phone. She also had fifteen (15) witnesses who were more of a character and dispositional nature than a trial nature. She did not speak with any of the alleged victims in the case nor did she hire an investigator to do so. She recalled there was a rape kit and DNA evidence.

She understood that under the plea agreement the worst scenario was that the Petitioner could receive an indeterminate sentence of thirty (30) to seventy (70) years, but in fact received twenty-five (25) to fifty-five (55) years. She advised the Petitioner of the best and worst case scenario under the plea. She also told him that she did not expect him to get probation. She usually tells her client to prepare for the worst case scenario. She frankly thought that he would receive the maximum sentence. She believed that the

Petitioner appreciated the seriousness of what he was doing and that he was not under any illusion as to getting probation. The Petitioner waived the attorney-client privilege so that Ms. French could answer these questions. She did not recall the Petitioner asking him to delay his sentencing so he could get married. She remembered that there were allegations that he had two victims in a hotel room with him and gave them wine coolers then allegedly sexually assaulted one of them. She does not recall the outcome of the DNA testing on the bedspread from the hotel. The DNA on the bedspread was never evaluated and she said that that would have been excellent cross-examination material and also would have made a good closing argument. The rape shield kit was negative which would also have been helpful. She was also asked about the fact that there was no alcohol in the victim's system, but stated she believed that it had metabolized overnight. She admitted that if the children misrepresented whether they were given alcohol that would have helped the defense. She would have used a lack of physical evidence as a trial tactic and would have not had the evidence independently evaluated because it was favorable to her client. At the time that the Petitioner entered the plea she had not completely formulated the defense that she would have used at trial and does not remember discussing that with him.

Ms. French never viewed the Petitioner as being severely limited intellectually. She was a little more concerned about his blacking out episodes than his mental capacity. She reviewed her protocol as to how she went over cases with her clients at different appointments. She does not believe that she would have discussed the impact of inconsistency between the statements with the Petitioner prior to the plea.

13

Ms. French stated that if the Petitioner went to trial he would have faced a minimum sentence of 110 years in the penitentiary. She stated that 11(e)1(c) and best interest pleas are not common in sexual offense cases. She stated that the Petitioner entered the plea because that's what he wanted to do and she denied forcing him to take the plea. Her file in this case was 500 pages long. She believed that she understood all the evidence at the time that she discussed a potential plea with Mr. T█████ and that at the time of his plea he understood what he was doing.

The Petitioner testified on his own behalf. It was agreed that the entire underlying criminal file would be made part of the habeas corpus proceeding. The Petitioner reviewed the preparation that he and Mr. Cassell went through for the habeas proceeding and the hearing. He stated that he had never been in trouble in his life before he was arrested on these charges. Ms. French and Mr. McFadden were appointed to represent him, but most of his dealing were with Ms. French. He stated that Ms. French never went over the evidence that the State had against him in preparing for the case, but he thought that she had provided him copies of the discovery, i.e. the statements, etc. She never discussed the value of the evidence with him. He did not know that a rape kit was taken from one of the victims. Ms. French did not review that with him, nor was he aware that it was negative. He was not aware that a bedspread was taken from the motel and that while there was DNA evidence obtained from the bedspread, it was never evaluated. He was not aware that one of the victims tested negative for alcohol. The Petitioner asserted his innocence and continues to assert it because he stated that he did not do this. When he took the plea he had no idea that the sentence would be lengthy. At that time he

14

wanted to get married and get the time over with. He did not believe he was going to get twenty-five (25) to fifty-five (55) years.

The Petitioner did not know there were inconsistencies in the statement of one of the victims. He never discussed the type of defense he would have had at trial with Ms. French. He stated that while Ms. French believed he was innocent, he should take the plea as it was in his best interest. He denies that Ms. French ever told him that he would probably get the maximum sentence of thirty (30) to seventy (70) years, but that he could come up for parole in fifteen (15) years. That's what he was hoping. When he was evaluated he told the doctor he was taking the plea because he didn't feel like his attorney was fighting for him. He planned on firing Ms. French but did not do it because he believed he wouldn't have had an attorney at all.

Habeas counsel reviewed the plea questionnaire with the Petitioner. He believed that he had no choice but to take the plea. He wanted to talk to Judge Knight and see if he could fire Ms. French and get another attorney. These answers, along with others, were changed in the questionnaire. He was forty-nine (49) years old at the time of sentencing. He would not have taken the plea if he thought he was going to get thirty (30) to seventy (70) years.

The Petitioner started having blackout episodes in 1985 when he was working for the railroad. No one could pinpoint the reason for his blackouts. He was disabled from the railroad as a result of it. He has had blackout spells periodically since the mid to late 1980's. His blackouts get worse when he is under stress. He could not, at the time of his plea, remember how long Ms. French had been representing him. He had a blackout during sentencing. He has trouble spelling and reading. Mr. Cassell had to explain the

15.

habeas memorandum to him. He was in special education when he was in school because he was slow.

Finally, Mr. Cassell reviewed the *Losh* checklist with the Petitioner. He believed his plea was involuntary because he didn't know all the facts of his case and he had difficulty understanding everything. He also believed he was going to get probation after fifteen (15) years. As for his mental health at the time of the crime and at time of trial, that was based on his blackout and memory problems and also on his ability to read and understand.

He did not ask his attorneys to appeal his sentence, but would have if he would have known one was available. He filed his claim for consecutive sentences because he received them in this case. He believed the plea bargain was unfulfilled because he believed he would go to the parole board after fifteen (15) years. He based his ineffective assistance of counsel claim on Ms. French's failure to convey his defense and to go over the plea bargain with him. He stated that she wouldn't go over anything with him.. He also stated that Ms. French did not interview the people he wanted her to assist in his case. These would have been character witnesses. He based his claim on competence at the time of the offense because of the issues he was having at the time of blackouts and the disability caused by an accident. He stated that Judge Knight made prejudicial statements about him. He finished his testimony by discussing his claims about the sufficiency of the evidence, the question of actual guilt upon acceptance of a guilty plea, severer sentence than expected, excessive sentence, mistaken advice of counsel as to parole/probation eligibility and amount of time served, including a credit for his home confinement time.

On cross-examination by the State, the Petitioner testified that he remembered everything Mr. Cassell has done for him in going over the case. He denied that Judge Knight ever asked him about his memory problems or his blackouts during the plea. He also got the Petitioner to admit that he may have told Judge Knight he was satisfied with Ms. French at the time of the plea.

At the conclusion of the hearing, Mr. Cassell asked the Court to keep the record open so that he could call Alice Scott and J██ T., one of the child victims of this case. Mr. Cassell stated that one of the victims had recanted to Ms. Scott. Another one of the victims, J██ T. said he was never abused and was willing to so testify. The Court left open the evidence for a further hearing to be held on October 15, 2014.

On that date, Mr. Cassell appeared with the Petitioner. Kelli Harshbarger, Esq. Assistant Prosecuting Attorney, appeared for the State. Habeas counsel advised the Court that the two witnesses would not assist Mr. Thompson's case, and so the record was complete.

## III. DISCUSSION

### A. HABEAS CORPUS DEFINED

Habeas Corpus is a "suit wherein probable cause therefore being shown a writ is issued which challenges the right of one to hold another in custody or restraint." Syl. Pt. 1. *State ex rel. Crupe v. Yardley*, 213 W. Va. 335, 582 S.E.2d 782 (2003). The issue presented in a Habeas Corpus proceeding is "whether he is restrained of his liberty by due process of law." *Id. At* Syl. Pt. 2. "A Habeas Corpus petition is not a substitute for

writ of error[1] in that ordinary trial error not involving constitutional violations will not be reviewed." *Id. At* Syl. Pt. 3.

## B. THE AVAILABILITY OF HABEAS CORPUS RELIEF

In *State ex rel. McCabe v. Seifert*, the West Virginia Supreme Court of Appeals delineated the circumstances under which a post-conviction Habeas Corpus hearing is available, as follows:

(1) Any person convicted of a crime and

(2) Incarcerated under sentence of imprisonment therefore who contends

(3) That there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State or both, or

(4) That the court was without jurisdiction to impose the sentence, or

(5) That the sentence exceeds the maximum authorized by law, or

(6) That the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common-law or any statutory provision of this State, may without paying a filing fee, file a petition for a writ of Habeas Corpus Ad Subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or other relief. 220 W. Va. 79 640 S.E.2d 142 (2006); W. Va. Code §53-4A-1(a)(1967)(Repl. Vol. 2000).

Our post-conviction Habeas Corpus statute, W. Va. Code §53-4A-1 *et seq.*, "clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a

---

[1] A writ of error issued by an appellate court to the court of record where a case was tried, requiring that the record of the trial be sent to the appellate court for examination of alleged errors.

matter of right, to only one post-conviction Habeas Corpus proceeding during which he must raise all grounds for relief which are known to him or which he could, with reasonable diligence, discover." Syl. Pt. 1, *Gibson v. Dale*, 173 W. Va. 681, 319 S.E.2d 806 (1984). At subsequent Habeas Corpus hearings, any grounds raised at a prior Habeas Corpus hearing are considered fully adjudicated and need not be addressed by the Court. *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

Yet, some limited exceptions apply to this general rule: "[a] prior omnibus Habeas Corpus hearing is *res judicata* as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however an applicant may still petition the court on the following grounds: (1) ineffective assistance of counsel at the omnibus Habeas Corpus hearing; (2) newly discovered evidence; (3) or, a change in the law, favorable to the applicant, which may be applied retroactively." Syl. Pt. 4, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).[2]

A Habeas Corpus proceeding is civil in nature. "The general standard of proof in civil cases is preponderance of the evidence." *Sharon B.W. v. George B.W.*, 203 W. Va. 300, 303, 507 S.E.2d 401, 404 (1998).

The West Virginia Supreme Court of Appeals has articulated the way for a Circuit Court to review Habeas Corpus petitions: "Whether denying or granting a petition for a writ of Habeas Corpus, the circuit court must make adequate findings of facts and

---

[2] On June 16, 2006, the West Virginia Supreme Court of Appeals held that a fourth ground for Habeas relief may exist in cases involving testimony regarding serology evidence. To summarize, the Court held as follows:

> A prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime serologist, other than a serologist previously found to have engaged in intentional misconduct, offered evidence may bring a petition for writ of Habeas Corpus based on the serology evidence even if the prisoner brought a prior Habeas Corpus challenge to the same serology evidence and the challenge was finally adjudicated.

*In re Renewed Investigation of State Police Crime Laboratory, Serology Div.*, 633 S.E.2d 762, 219 W. Va. 408 (2006).

19

conclusions of law relating to each contention advanced by the petitioner, and state the grounds upon which the matter was determined." *Coleman v. Painter*, 215 W. Va. 592, 600 S.E.2d 304 (2004).

## C. FINAL LIST OF GROUNDS ASSERTED FOR ISSUANCE OF A WRIT OF HABEAS CORPUS, AND THE COURT'S RULINGS THEREON

The Court has carefully reviewed all of the pleadings filed in this action, the transcript of the omnibus hearing, the Court files in the underlying criminal action, the transcripts of the plea and sentencing hearings, and the applicable case law. The Court has also reviewed the *Losh* checklist filed by the Petitioner with his Petition for Writ of Habeas Corpus.

The matters before this Court for review are:

1. Whether the Petitioner's Federal And State Constitutional Rights Were Violated By Trial Counsel's Ineffective Assistance:

   (a) Trial counsel was ineffective with regard to the Petitioner's defense to the charges;

   (b) Trial counsel was ineffective with regard to recommending that Petitioner accept a highly unfavorable best interest plea;

   (c) Trial counsel was ineffective in failing to secure the results of DNA evidence and Petitioner's Constitutional Rights are violated by the State's loss of that evidence;

   (d) Trial counsel was ineffective with regard to Mr. T█████'s mental state.

2. Whether the Petitioner's plea was knowingly, intelligently, and voluntarily made.

3. Whether the Petitioner's State and Federal Constitutional Rights were violated by his disproportionate sentence.

20

4. Whether the Petitioner's State and Federal Constitutional Rights were violated by the inadequate indictment.

5. Whether the Petitioner's Federal and State Constitutional Rights were violated by the additional grounds raised in the Petitions.

Although the Petitioner raised the grounds of not being provided with a preliminary hearing and not having been given his Miranda rights at the time of his arrest, these grounds were not marked on the *Losh* checklist, and as such, are abandoned. Further, they were not addressed by the Petitioner during his Omnibus Habeas Corpus hearing. The other issues raised in the Petitioner's *Losh* checklist are subsumed in the above-referenced matters, and are addressed, *supra*.

## 1. WAS COUNSEL INEFFECTIVE?[3]

### a. The Petitioner's Argument:

**PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE VIOLATED BY TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE.**

The West Virginia Supreme Court has recognized that the Sixth Amendment to the Constitution of the United States and Article 3, Section 14 of the Constitution of West Virginia mandate that a Defendant, in a criminal proceeding receive "competent and effective assistance of counsel." *State ex. rel. Strogen v. Trent* 469 S.E. 2d 7, 9-10. (W.Va. 1996)(numerous citations omitted).

According to the Supreme Court, claims of ineffective assistance of counsel are to be governed by the two prong test established by the United States Supreme Court in *Strickland v. Washington*, 466 US 668 (1984): (1) counsel's performance was deficient

---

[3] All Exhibits referenced in this section of the order relate to those filed with the pleadings of the parties.

under an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* at 12. The West Virginia Supreme Court has established that in reviewing counsel's performance, Courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance. *Id.* "Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." *Id.* (citations omitted).

Importantly, the West Virginia Supreme Court has recognized, just as the United States Supreme Court recognized earlier, that any presumption that counsel's conduct does fall within the range of reasonable professional assistance does not apply where counsel's strategic decisions are made after an inadequate investigation." *State ex rel. Vernatter v. Warden,* 528 S.E. 2d 207, 213 (W. Va. 1999), citing *State ex. rel. Daniel v Legursky,* 465 S.E. 2d 416, 422 (W.Va. 1995).

The Court has stated that "counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *State ex. rel. Daniel v. Legursky* 465 S.E. 2d 416, 422 (W.Va. 1995). The West Virginia Supreme Court has recognized that in applying the standard, "courts . . . have found no difficulty finding ineffective assistance of counsel where an attorney neither conducted a reasonable investigation nor demonstrated a strategic reason for failing to do so." *Id.* at 422.

In this case, counsel was ineffective in the following ways:

**TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO THE PETITIONER'S DEFENSE TO THE CHARGES.**

In this case, the main evidence against the defendant was the unverified testimony of the three alleged victims. The only physical evidence was alleged DNA and an attempt to confirm that the Petitioner had provided alcohol to the female victims. The DNA evidence from the alleged victim yielded no results, DNA from a bedspread wherein sexual contact has supposedly occurred was never tested and is now lost. (*See* Ex. 10, 11). The alcohol evidence revealed that the alleged victim did not have alcohol in her system. (*See* Ex. 9). Thus, the core of the case was the testimony of the child victims.

The testimony of J███ T. was highly suspect due to incidents wherein she had previously lied about sexual contact, and numerous other misrepresentations made by her. A review of the evidence in the case reveals an incredible number of inconsistencies and other items that suggest that Jessica's story is not true:

- J███ made a false allegation that Petitioner had sexually abused her in 1998 (*See* Statement of Helen T███ (J███'s mother and petitioner's ex-wife) attached hereto as Ex. 7 at pp. 2-3);

- In fact, J███ was actually abused by another person with regard to the 1998 incident (Ex. 7 at 3);

- J███ had made allegations against other persons as well, including petitioner's son, Carl, Jr. ███ allegedly getting in the bathtub with her and another time getting on top of her (Ex. 7 at 5, 7-8);

- Helen T███████ denied that J████ T. had ever reported any incidents of sexual contact by Petitioner to her despite the fact that J_____ T. alleged that her mother had discovered that Petitioner was abusing J███ when she was about five or six years old and J████ had reported abuse to her at an unspecified later date (Ex. 7 at 13, *See* Bluefield Police Department Complaint Report, Statement of J███ T attached as Ex. 8 at 15, 31-32, 39);

- J████ had reported that Carl was taking showers with her, which was investigated by DHHR and determined to be unfounded (Ex. 7 at 17-18);

- Helen was told by Officer Myers of the Bluefield P.D. that to ever get her children back she had to sever all ties with petitioner (Ex. 7 at 28); and

- J████ reported that Petitioner gave L.S. wine coolers on the night of the incident, but her blood alcohol analysis revealed no alcohol (E. 8 at 7, Forensic Toxicology report attached as Ex. 9).

Likewise, although J████ T. was supposedly in the room when L.S. was sexually penetrated, she never saw nor heard anything. (Ex. 8 at 5, 16).

All of these factors demonstrate that petitioner had a viable defense. However, that defense was never communicated to him. Rather, he was encouraged to take a plea that would in all likelihood constitute an effective life sentence because Petitioner will be approximately 74 years old when first eligible for probation and nearly 77 years old when he completes the sentence provided that he receives good time credit.

24

## TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO RECOMMENDING THAT PETITIONER ACCEPT A HIGHLY UNFAVORABLE BEST INTEREST PLEA.

Because of trial counsel's inadequate investigation, Mr. T███████ contends that their advice concerning taking the plea was ill and inadequately informed. Further, given the nature of the plea it was always highly unlikely that Petitioner would ever be freed under the plea. Thus, the case should have been taken to trial.

Recently, the United States Supreme Court affirmed the critical nature of effective client assistance in plea negotiations. According to the Court, defendants have a Sixth Amendment right to counsel that extends to the plea bargaining process. *Lafler v. Cooper*, 132 S.Ct. 1376, 1384, 182 L.Ed.2d 398, 406, 80 U.S.L.W. 4244, ___ (2012). This arises from the fact that "criminal justice today is for the most part a system of pleas, not a system of trials. Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas." *Id.* at 1388, 411, ___." In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Missouri v. Frye*, 132 S.Ct. 1399, 1407, 182 L.Ed.2d 379, 390, 80 U.S.L.W. 4253, ___ (2012). The Supreme Court concluded that "the right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences." *Lafler v. Cooper*, 132 S.Ct. 1376, 1388, 182 L.Ed.2d 398, 411, 80 U.S.L.W. 4244, ___ (2012).

During plea negotiations defendants are constitutionally entitled to the effective assistance of competent counsel. The Court applied the *Strickland* standard to determine if there was ineffective assistance. To meet the *Strickland* test with regards to pleas, there must be a showing that the representation fell below an objective standard of

25

reasonableness and the outcome of the plea process would have been different with competent representation. *Id.* at 1384, 407, ____. The West Virginia Supreme Court of Appeals has also confirmed the requirement of effective assistance of counsel during the plea bargaining process. *E.g., Becton v. Hun*, 205 W.Va. 139, 516 S.E.2d 762 (1999).

Here, trial counsel was ineffective for failing to undermine the state's case through a thorough investigation. Thus, all advice given was based on an inadequate foundation. Further, the terms of the plea are so unfavorable to Petitioner that the plea offers extremely little. In examining the terms of the plea, any reasonable attorney would expect the defendant to receive an effective life sentence. Evaluating the plea in an objective manner, supports Petitioner's contemporaneous claim that he only took the plea because of counsel's lack of preparation in failing to "work on his behalf." (6/4/07 Evaluation attached as Ex. 14 at 2). Of even greater concern, counsel apparently never warned Petitioner of the extreme difficulty in getting any sort of leniency or alternative sentence when he could not honestly admit to committing the sexual crimes. As aptly noted by the evaluator in the mandatory sex offender evaluation, because defendant denies any "criminal sexual acts," "a treatment plan cannot be developed or recommended." (Ex. 14 at 4). That denial, in the court's mind, made the defendant "not a fit and proper subject...for probation in any way." (Ex. 13 at 5). Thus, the plea offered Petitioner virtually no advantage and could not be in his best interest.

### TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO SECURE THE RESULTS OF DNA EVIDENCE AND PETITIONER'S CONSTITUTIONAL RIGHTS ARE VIOLATED BY THE STATE'S LOSS OF THAT EVIDENCE.

In this case, despite the allegation of sexual penetration of L.S., and the timely retrieval of a rape kit, no DNA from the Petitioner was found. Further, although an

26

alleged semen stain was found on the motel bed where the crime supposedly occurred, that semen was never evaluated for DNA. Trial counsel should have done so, as the lack of DNA evidence coupled with the fact that the alleged victim had no alcohol in her system even though she and J████ T. both claim that Petitioner had given alcohol to them, would have been compelling evidence that the alleged victims were not telling the truth. Unfortunately, Petitioner cannot now rectify that mistake because the evidence has been lost. (*See* Ex. 9, 10, 11). The United States Supreme Court has held that failing to preserve such exculpatory evidence constitutes a denial of a defendant's constitutional right to due process. *Arizona v. Youngblood*, 488 U.S. 1, 102 L.Ed. 2d 281, 109 S.Ct. 333 (1988). Here, there is no reason for the evidence not to have been preserved and Petitioner's due process rights are violated by the loss of the evidence.

### TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO MR. THOMPSON'S MENTAL STATE.

Mr. T████'s mental state was always at issue. Even prior to the plea, his competency evaluation revealed a documented, decades-long issue with blackouts and mental illness. (4/5/07 Evaluation attached as Ex. 15 at 9-10). He was on a substantial amount of medication for these issues and other physical ailments. (Ex. 14 at 1-2, 4). Petitioner and his loved ones reported these incidents to his attorneys. (*E.g.* Letter dated 4/10/07 attached as Ex. 16). Even during the plea hearing, Mr. Thompson had significant difficulties in: remembering how long his attorney had represented him (Transcripts of 4/20/07 hearing attached hereto as Ex. 12 at 4), expressed concerns about being drowsy (Ex. 12 at 8), and discussed his blackout issues (Ex. 12 at 9). Mr. S████ (sic) lack of understanding of the process is explained by his desire to re-marry after pleading to charges that would obviously imprison him for a lengthy period of time. (Ex. 12 at 23-

27

25). Prior to sentencing, Petitioner's fiancée reported severe blackouts to the court. (Letter dated 6/18/07 attached as Ex. 17). At sentencing, Mr. T███████ suffered a blackout that was dismissed by the court despite the substantial evidence that Petitioner had a long history (before any involvement with this case) of such incidents. (Transcript of 6/27/07 hearing attached as Ex. 13 at 2-3, 5-6). All of this demonstrates an abnormally well-documented and witnessed history of mental defect that should have been better explored by trial counsel.

### b. The State's Response:

### INEFFECTIVE ASSISTANCE OF COUNSEL

That the State agrees with the legal standard set forth in said Petition, but denies that any claim of Petitioner is meritorious or otherwise entitles him to relief. With reference to the Amended Petition the State would argue:

The State disputes the Petitioner's contention that his trial counsel was ineffective. The Petitioner contends that the Respondent's plea was not knowingly, intelligently and voluntarily made. However, it appears clear from the transcript of the Plea Hearing that the Petitioner's plea was knowingly, intelligently and voluntarily made. Judge Knight took considerable time in questioning the Petitioner to make sure that he understood the plea agreement, the plea papers and his rights. Judge Knight asked the Petitioner if the answers to the questions in the plea papers was in his own handwriting. The Petitioner answered that some of the answers were in his hand writing and some were in his attorney's hand writing. The Petitioner further answered that his attorneys answered any questions that he had.

28

Judge Knight also asked several questions concerning the length of time that his counsel had been involved with the case and the number of times that they met. It appeared clear from the transcript that Ms. French had met with him in excess of four hours in preparing the plea papers and the (sic) Mr. McFadden was present for several of those meeting. They stated that the Respondent understood the plea agreement, the plea papers and the rights that he was waiving and the Respondent agreed with their representations.

The Court also questioned the Defendant about his mental state. It is clear from the transcript of the plea hearing that the Defendant answered all questions appropriately. The Defendant also explained his blackouts to the Court and further stated that he did not suffer from any long term memory loss as a result of his blackouts. In fact, the Defendant stated several times that his blackouts caused him to loose (sic) memory for about 45 minutes and then everything would come back to him. He was even able to recount past experiences, which further shows his ability to answer questions appropriately.

The State disagrees with the Petitioner's contention that Defense Counsel was ineffective by failing to secure and test the semen stain found on the bed of the hotel for DNA. DNA was never recovered from the rape kit. Therefore, the Defendant could use the lack of DNA and alcohol in the victim's bloodstream to argue reasonable doubt. However, the DNA could have been as inculpatory as it was exculpatory. The DNA sample could have been a match for the Defendant.

29

## c. Findings of Fact and Conclusions of Law:

The Court makes the following specific findings of fact and conclusions of law

regarding the Petitioner's claim of Ineffective Assistance of Counsel:

(1) The Court **FINDS** that the West Virginia Supreme Court of Appeals stated the

test to be applied in determining whether counsel was effective in *State v.*

*Miller:*

> In the West Virginia courts, claims of ineffective
> assistance of counsel are to be governed by the two-
> pronged test established in *Strickland v.*
> *Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80
> L.Ed.2d 764 (1984): (1) Counsel's performance
> was deficient under an objective standard of
> reasonableness; and (2) there is a reasonable
> probability that, but for counsel's unprofessional
> errors, the result of the proceedings would have
> been different. *State v. Miller,* 194 W.Va. 3, 459
> S.E.2d 114 (1995), syl. pt. 5.

(2) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also

held that:

> Where counsel's performance attacked as
> ineffective arises from occurrence involving
> strategy, tactics, and arguable courses of action, his
> conduct will be deemed effectively assistive of his
> client's interests, unless no reasonably qualified
> defense attorney would have so acted in the defense
> of the accused. *State ex rel Humphries v. McBride,*
> 220 W.Va. 362, 645 S.E.2d 798 (2007) syl. pt. 5. In
> accord, Syllabus point 21, *State v. Thomas,* 157
> W.Va. 640, 203 S.E.2d 445 (1974).

(3) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also

held that:

> [i]n reviewing counsel's performance, courts must
> apply an objective standard and determine whether,

30

in light of all the circumstance, the identified acts omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995) syl. pt. 6.

(4) The Court **FINDS** that on the issue of competency to stand trial, the West Virginia Supreme Court of Appeals held in *State v. Milam*, 159 W.Va. 691, 226 S.E.2d 433 (1976), that:

No person may be subjected to trial on a criminal charge when, by virtue of mental incapacity, the person is unable to consult with his attorney and to assist in the preparation of his defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him. Syl. Pt. 1

(5) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

It is a fundamental guarantee of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent. *State v. Hatfield*, 186 W.Va. 507, 413 S.E.2d 162 (1991), Syl. Pt. 6, following *State v. Cheshire*, 170 W.Va. 217, 292 S.E.2d 628 (1982). Syl. Pt. 1

(6) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

When a trial judge is made aware of possible problem with defendant's competency, it is abuse of discretion to deny a motion for a psychiatric evaluation. *State v. Hatfield*, supra at Syl. Pt. 2, citing Syl. Pt. 4, in part, *State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980).

31

(7)  The Court **FINDS** that the West Virginia Supreme Court of

Appeals has also held in *State v. Sanders*, 209 W.Va. 367, 549

S.E.2d 40 (2001):

> Importantly, since the right not to be tried while
> mentally incompetent is subject to neither waiver
> nor forfeiture, a trial court is not relieved of its
> objection to provide procedures sufficient to protect
> against the trial of an incompetent defendant merely
> because no formal request for such has been put
> forward by the parties . . . In other words, a trial
> court has an affirmative duty to employ adequate
> procedures for determining competency once the
> issue has come to the attention of the Court,
> whether through formal motion by one of the parties
> or as a result of information that becomes available
> in the cause of criminal proceedings.

(8)  The Court **FINDS** that the West Virginia Supreme Court of

Appeals has also confirmed its process for determining whether

a broad inquiry into a defendant's mental competency is

constitutionally required in *Sanders*:

> Evidence of irrational behavior, a history of mental
> illness or behavioral abnormalities, previous
> confinement for mental disturbance, demeanor
> before the trial judge, psychiatric and lay testimony
> bearing on the issue of competency, and
> documented proof of mental disturbance are all
> factors which a trial judge may consider in the
> proper exercise of his (or her) discretion (to order
> an inquiry into the mental incompetence of a
> criminal defendant.) *Sanders*, Syl. Pt. 6, following
> Syl. Pt. 5, *State v. Arnold*, 159 W.Va. 158, 219
> S.E.2d 922 (1975).

32

(9) The Court **FINDS** that the West Virginia Supreme Court of Appeals also held in *State v. Myers*, 159 W.Va. 353, 222 S.E.2d 300 (1976) that:

> "When a defendant in a criminal case raises the issue of insanity, the test of his responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law, and it is error for the trial court to give an instruction on the issue of insanity which imposes a different test or which is not governed by the evidence presented in the case."

(10) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held, as to the burden of proof when a criminal defendant claims lack of criminal responsibility that:

> "There exists in the trial of an accused a presumption of sanity. However, should the accused offer evidence that he was insane, the presumption of sanity disappears and the burden of proof is one the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense." Syl. Pt. 2, *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979).

(11) The Court **FINDS** that at the omnibus habeas corpus hearing, the Petitioner testified as follows on the issue of his trial counsel's ineffective representation:

Q    Now during the course of your case, you and I talked about the evidence that existed against you in this case. Is that right?

A    Yes.

33

Q      And did Ms. French go over the evidence that the State had against you in these cases?

A      Not at all.

Q      Did she provide you with a copy of the discovery, the statements and those things?

A      I think so.

Q      All right.  But did she ever review those with you to discuss, you know, the value of that evidence or how that evidence seemed or how - - did she - -

A      No.  She - -

Q      Did she ever evaluate that evidence with you?

A      No, she did not.

Q      I advised you that there was a rape kit taken in this case from L.S.  Were you aware of that fact?

A      I didn't know anything about it.

Q      Had Ms. French ever reviewed that fact with you?

A      No, she did not.

Q      Did she ever — and since she didn't review it with you, you didn't know the rape kit had proved negative, that there was no —

A      I didn't know anything about it.

34

Q       Did Ms. French review with you the fact that there was a bedspread taken from the hotel bed where the alleged sexual act had occurred?

A       Didn't know anything about that.

Q       Did you know that there was DNA evidence obtained from that?

A       No, I didn't know anything about it.

Q       Did you know that that evidence was never evaluated?

A       See, I didn't know that neither.

Q       Were you aware that there was a test done of L.S., a test to determine if she had any alcohol in her bloodstream?

A       Didn't know that.

Q       Did you know that that test was negative?

A       Didn't know that.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 53, L:21 thru p. 55, L:17)

(12)     The Court **FINDS** that the Petitioner further testified on his counsel's representation as follows:

Q       Now J███ T. was your stepdaughter and your niece. Is that right?

A       That is correct.

35

Q     And you plead guilty on a best interest plea on some charges related to her. Is that right?

A     Yes.

Q     Were you aware there were some inconsistencies in her statements?

A     I did not.

Q     We've identified those inconsistencies in the memorandum I provided to you and went over with you.

A     Yes.

Q     Do you remember that?

A     Yes.

Q     Did Ms. French ever discuss any of those inconsistencies with you?

A     No, sir.

Q     Did you ever discuss with Ms. French what type of defense you would have if you'd taken these charges to trial?

A     No, sir.

Q     Did she ever give you any hope at all that you had any hope of proving your innocense or avoiding your condition should you take your case to trial?

A     Well, she told me herself that she believed I

was innocent but to take this plea bargain would be in my best interest, she said.

Q      Why did you take the plea bargain if you were innocent?

A      Well, like I said, I've never been through anything like this. I didn't know what to do, to be honest with you, to do what was right or whatever, you know. I didn't know anything about it.

Q      Now with this plea bargain, you heard Ms. French say today that, based on her knowledge and experience she expected you to receive the maximum of a thirty year to seventy year sentence. Did she ever convey that to you?

A      No, she did not. But she did tell me if I did take this plea I maybe to come up for parole within fifteen years.

Q      And is that what you were hoping would happen?

A      That's what I was hoping that would happen.

Q      Did — did you express to the person — do

37

you remember the person who conducted your evaluation, your mental health evaluation to see if you were competent and criminally responsible?

A    They sent --

Q    Do you recall seeing that doctor?

A    They sent me to some doctor in Charleston.

Q    Do you remember telling that doctor that the reason you were taking that plea is because you didn't feel like your attorney was fighting for you?

A    That's exactly what I told him.

Q    Is that how you were feeling at the time?

A    That's how I was feeling.  Yes.

Q    Did Ms. French ever convey to you anything that may have lead you to believe that you had any chance of success if you went to trial in this case?

A    No.  See, I was going to fire her but I thought if I fired her I wouldn't have no attorney at all, so I just kept her.

Q    Well, while were on that, let's talk about the questionnaire that you filled out.

MR. CASSELL: Your Honor, can I approach?

THE COURT: Uh-huh.

BY MR. CASSELL:

38

Q    Now you asserted -- you asserted in that that you were innocent. Correct?

A    Amen.

Q    And when you were asked if there were any words in the Indictment that you do not understand, you initially said yes. Is that your handwriting there on Question 25?

A    25. That's my handwriting. Yes, sir.

Q    And then it's marked out and then it's put no.

A    Somebody marked it out. I don't know who did.

Q    All right. And in Question 26, it says, "If there are, what are they?" And what did you write?

A    On 26?

Q    Uh-huh.

A    "I really don't understand any of it."

Q    Is that how you were feeling on the day you were filling out this questionnaire?

A    Yes, sir. I mean, I try to be as honest as I can.

Q    Now when you were asked if anyone had

39

threatened you with a denial of probation or a more severe sentence or prosecution for some other offense, you wrote -- -- or coerced you, you wrote, "Because my lawyer said it would be in my best interest to." What do you mean by that?

A   That's what she told me, it would be in my best interest to take the plea.

Q   Did you feel like she would - - did you feel like you had to take the plea?

A   In a way, yes.

Q   Describe that to the Judge what you mean by that.

A   Well, I felt like I had no choice but to take the plea.

Q   Why --

A   The thing of it is, if I'd knew all of this, if she would have let me know all about this rape thing that they did on L█████ and this alcohol thing on L███ and stuff, I'd probably told her no, let's take it to trial because I know without a doubt there's no evidence that I did this crime.

Q   In Question 65 you were asked if you were satisfied with the services of your attorney. What did you write on that question?

40

A     On what?

Q     Question 65.

A     65.  I put no, but see it's been marked out and somebody wrote yes on it.

Q     Were you dissatisfied with the services of your attorney at the time?

A     Yeah, I wasn't getting no services on my attorney to be honest with you.  She would just — when she talked to me it was just mumbo-jumbo.  She wasn't telling me anything that was encouraging.

Q     You also answer that there was something you wanted to discuss with the Court —

A     I did.

Q     — in private before the plea was accepted. What did you want to discuss with the Judge?

A     I wanted to talk to the Judge and see - - at that time I wanted to talk to the Judge and see if I could fire her and get another counsel.

Q     Now those answers were changed to Question 65 and you put your initials by them, did you not?  Are those your initials right there (indicating)?

A     Those are my initials.

Q     And did you write that?

41

A     I guess I did.

Q     Well, look at it. You ought to know your own handwriting. Is that your handwriting?

A     That looks like my handwriting, yes.

Q     All right. So do you know why you consented to those being changed? Do you remember?

A     Don't remember.

Q     Regardless of whatever you were told, did you still have concerns about Ms. French at the time you entered your plea?

A     Do what?

Q     Regardless of what you were told by Ms. French to get you to change those answers, were you -- did you still have concerns about your lawyer when you were entering your plea?

A     Yes, I was.

Q     Now at the time you were sentenced in this case, how old were you?

A     I was forty-nine.

Q     All right. So if you received a thirty year sentence before you see the parole board, how old would you have been?

A     Oh, I don't know.

Q    Seventy-nine years of age?

A    I don't know.

Q    Do you think -- did you think that your fiancé was going to wait thirty years for you?

A    I know I was supposed to go up for parole in 2032.

Q    You had in your mind that you were going to be able to continue your life after this plea, when you accept this plea that you were going to be able to move on with your life.

A    Yeah.

Q    But in fact, Ms. French, she never told you that she thought you were going to get a thirty to seventy, did she?

A    No, she did not.

Q    If you'd thought that would you have taken this plea?

A    No, I would not have. The thing of it is, sir, I don't want to die in prison for something I did not do.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 57, L:1 thru p. 64, L:18)

43

(13) The Court **FINDS** that the Petitioner also testified on the same issue as follows:

> Q  The ineffective assistance of counsel, does that relate to Ms. French's failure to convey to you your defense in the case?
>
> A  That is true.
>
> Q  And also her failure to go over the plea bargain with you?
>
> A  Exactly right. She wouldn't go over anything with me with my case.
>
> (*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 70, L:13 -20)

(14) The Court **FINDS** that the Petitioner specifically testified on his claim that his trial counsel failed to subpoena witnesses:

> Q  With regard to refusal to subpoena witnesses, was that related to the fact that Ms. French had not gone and talked to all the people that you wanted her to?
>
> A  That's exactly right.
>
> Q  And were those people that could basically say you wouldn't do this type of thing?
>
> A  That's exactly right.
>
> Q  These were character witnesses, right?
>
> A  Yes.

44

Q    All right.

A    But these are people that's known me for a
long long time and they know I'm not that kind of man.
They know I love children. I do, I love children. And I
love teaching children right from wrong, if you understand
what I'm saying. I try to teach them right and try to help
them.

I mean, I had one girl that would come to my house and
said, "I wish you were my daddy," because I help her a
whole lot. So I mean, I'm just that way. I just want to help
people, especially young people.

*(See* Transcript of Omnibus Habeas Corpus hearing of
August 13, 2014, at p. 70, L:21 thru p.71, L:18)

(15)    The Court **FINDS** that the Petitioner also testified about
his mental condition:

Q    I want to talk about blackout episodes. Tell
the Judge when those started.

A    Well, they started in 1985.

Q    What caused them to start?

A    I was on the machine that I run on the
railroad and I had to climb the boom to put a pin in. Well,
by the time I got to the top of that boom, I don't know how
— how much feet it was, a blackout spell hit me and I hit —

45

almost hit the railroad track. And they said if I'd been over about another five foot I would have broke my neck. Well, they told me to go to a doctor and get checked out. So I got — went to a doctor and got checked out and they started sending me to Charlottesville to the big university out there and they sent me to Kentucky University. And they can't pinpoint — neither doctor could pinpoint what was causing the blackouts.

And they had to disable me from the railroad because they said I was too dangerous. I could hurt someone or hurt myself.

Q      So were you declared permanently disabled?

A      I was. Yes.

Q      What was it, thirty years ago now?

A      Yes, sir.


Q      Was it in the '80s?

A      1987, sir. Or 1986.

Q      And have you had these blackout spells periodically since then?

A      Yes.

Q      And were you have problems with these

46

blackout spells during the course of this case, this criminal case?

A     Yes.

Q     Do your blackout spells get worse when you're under stress?

A     Yes.  And I lose my memory.  There's times when I didn't even know who I was.

Q     Were you having difficulties with that?

A     Yes.

Q     Did you convey that to — did you tell that to Ms. French?

A     Yes.

Q     And in fact, in some of the transcripts you couldn't — in the transcript from April 20th, 2007, you couldn't remember how long your attorney had represented you, could you?

A     No.


Q     And you also expressed concerns about being harassed about your blackout issues?

A     Yes.

Q     Did you suffer a blackout during the course of the sentencing?

47

A    Yes, I did.

Q    Were you faking that, Mr. T█████████?

A    No, sir. I didn't know nothing until I was on the bus going to Beckley. When I come to I was on a bus going to Beckley.

Q    Now Mr. T██████, you and I have spent a considerable amount of time together reading things and that kind of thing. Do you have trouble reading?

A    A little.

Q    Do you have trouble spelling?

A    Yes, sir.

Q    Can you read complex — or can you read legal paperwork?

A    I can read it but understanding it is another story.

Q    In fact, regarding the memorandum I filed in your case, you couldn't understand that until I explained it to you, could you?

A    That's exactly right, sir.

Q    You and I have spent a considerable amount of time going over that page by page for you to understand it. Is that right, sir?

A    Yes.

Q    Now when you were in school were you ever identified as having any sort of issues?

A    Well, I was in Special Ed when I was in school.

Q    Tell the Court about that. What kind of special ed did you receive?

A    I was just — instead of me going to a regular school I was going to a school that was for special needs children.

Q    Was that because you were slow?

A    Slow. Yes, sir.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 64, L:22 thru p. 68, L:16)

(16)    The Court **FINDS** that the Petitioner continued this testimony:

Q    All right. With regard to your mental health at time of crime and time of trial, is that based on these blackout problems and memory problems that you described to the Court?

A    Yes, sir.

Q    And also is that related to your issues with regard to your ability to learn to read and understand?

49

A    Yes, sir.

(*See* Transcript of Omnibus Habeas Corpus hearing of
August 13, 2014, at p. 69, L:10 - 17)

(17)    The Court **FINDS** that the Petitioner also addressed this
ground at the conclusion of his testimony:

Q    With regard to your claim of incompetency at
the time of offense, as opposed to time of trial, is that again
related to the fact that you have all these issues with regard
to the blackouts and the disability was caused by the
accident?

A    Yes, sir.  I even went to a place that they
take care of, you know, -- where they treat mental people.
I went there I think about twice a week.  I think it was a
place called -- it was down in Welch, Southern Highlands
and they helped me quite a bit on trying to understand
things.

Q    Was this something that you'd done for a long
period of time?

A    Yes.  Yes.

(*See* Transcript of Omnibus Habeas Corpus hearing of
August 13, 2014, at p. 71, L:19 thru p. 72, L:9)

(18)    The Court **FINDS** that trial counsel Elizabeth ⟍, Esq., testified about her investigation of the Petitioner the omnibus hearing:

> Q    Ms. French, I apologize to you but I just actually found information about what I'm going to about next shortly before walking into this courtroo you ever have an investigator speak to J███ T███
>
> A    No.

(*See* Transcript of Omnibus Habeas Corpus hearing August 13, 2014, at p. 22, L:8 - 13)

(19)    The Court **FINDS** that trial counsel also testified a follows about her investigation:

> Q    Did you hire a private investigator in this case?
>
> A    I did not. I interviewed the witnesses that I spoke with personally by phone contact. It look∈
>
> Q    Do you recall --
>
> A    -- I had a lot of --
>
> Q    -- all of them?
>
> A    No, I do not recall. I think I disclosed a total — I'm going by memory after looking at sor information. I think I disclosed approximately fi:

51

witnesses. I do not recall their names nor do I recall which ones I spoke with and did not.

I had notes on my witness list that certain witnesses appeared to be more of a character or dispositional or a sentencing nature rather than a trial nature.

Q    Did you speak with any of the alleged victims in the case?

A    No, I did not.

Q    And did you — and you did hire an investigator to speak to those alleged victims?

A    No, I did not.

Q    So your investigation with regard to the evidence against the State (verbatim) was based on the disclosures filed by the State and given to you in discovery?

A    And what I gleaned from the witnesses that Mr. T███████ asked me to speak to.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 34, L:7 thru p. 35, L:12)

(20)    The Court **FINDS** that trial counsel also testified about her rationale for how she handled the DNA issue at the hearing:

Q    Okay. Do you recall there being a rape kit and DNA evidence in this case?

52

A     Not until you mentioned it to me in the hallway.

Q     Okay. So I guess you don't recall how you evaluated that evidence or what you did with that evidence?

A     Correct. Again, I apologize. It's been too long. I did not actually read the discovery yesterday. I scanned it.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 35, L:13 - 22)

(21)     The Court **FINDS** that trial counsel further addressed the DNA question at the hearing:

Q     With regard to the victim L.S., I'll represent to you that some of those charges relate to an incident that occurred in a hotel room. Do you remember that, anything about that issue?

A     Again, just in reviewing the file, scanning it and speaking with you, is that the situation where he supposedly gave the two girls wine coolers? I somewhat recall that.

Q     And so the allegation was that he gave them - - the two girls stayed with him in a hotel room, it was a snowy night and all this stuff, they were staying in a hotel

53

room, he provided the girls with alcohol and then allegedly sexually assaulted L.S. who was one of his victims. After that, there was a rape kit taken immediately of L.S. because she reported it to her mother the next morning after she picked her up and a bedspread was taken from the hotel room. Do you recall any of the outcome of the testing on either of those?

A    I do not.

Q    Would the fact that the DNA on the bedspread was never evaluated, would that cause you concerns regarding whether or not you knew all you needed to know about the case?

A    That would have made excellent cross-examination questions of the investigating officer and it certainly would have been good for closing arguments.

Q    So if the DNA evidence wasn't it, that would have been important information to know?

A    Yes.

Q    Also the rape kit was negative. It didn't show any sperm or any DNA. Is that something that would have been useful to the defense?

A    Again, during trial it most certainly would have been.

54

Q       How about if there was alcohol testing done on the child the next day and there was no alcohol in her system?

A       I believe that Mr. T███████ only gave the children one or two beers — — or wine coolers, excuse me. They would not have tested positive the next day.

Q       You think that would have been metabolized?

A       Correct.

Q       Do you remember investigating that issue, how long it had been between the time of the alleged alcohol ingestion and the time of the testing?

A       No.  Common knowledge.

Q       Okay.  But do you remember when the test was done?

A       No.

Q       Do you know when the alcohol was last given?

A       No.

Q       Those would be important facts to understand with regard to determine if the children are lying about being given the alcohol?

A       Yes.

Q       If you could prove the children were

misrepresenting the fact that they were given alcohol, would that be something that would be useful to you in your defense?

A       Yes.

Q       Do you recall reviewing any of these issues regarding this type of physical evidence with Mr. T█████?

A       No.

Q       And why do you — can you tell us why you didn't review that? Or you just don't remember? Do you think you did review it?

A       I don't think so. That's something I would have used for trial tactics. I would not have filed a motion for independent scientific testing unless there were results that were unfavorable to Mr. T█████, then I would have to see if it could be disproven. But the lack thereof of any testing, I would have used as a trial tactic.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 41, L:3 thru p. 44, L:9)

(22)     The Court **FINDS** that Petitioner's trial counsel also discussed her explanation of the best interest plea to the Petitioner:

Did Mr. T█████ enter a best interest plea in this case?

56

A    He did. It was a Rule 11-E best interest plea.

Q    And what did he gain pursuant - - or what guaranteed disposition was he getting under Rule 11(E)1(c)disposition? Do you recall?

A    Under the Indictment he was looking at a minimum of one hundred and ten years. I do not recall what the maximum was. With the plea, there were three sets of charges that he was pleading guilty to.

Q    One set for each victim?

A    Correct. That is correct.

Q    Okay.

A    And the State recommended that the sets themselves run concurrent, however the Judge maintained discretion to order the individual — or the sets as a whole to run concurrent or consecutive.

Q    And let me rephrase that and see if I'm rephrasing it correctly, Mr. French. And you can feel free to correct me.
With regard to each child, Mr. T███████ was pleading to certain charges. And under the plea, those charges would run concurrent.

A    Correct.

57

Q       But the Judge retained, under the 11(E)1( c)
plea the right to sentence the charges with regard to the
separate children consecutive so that the charges for J█████
could be consecutive to the charges to J███ and consecutive
to the charges for L.S., the other victim.

A       If I remember correctly — I have not studied
the counts to which he plead guilty. It seems to me that if
he plead guilty to two Sex Assaults in the First Degree
those two would have run concurrently together under the
plea. And then if he plead guilty to two counts of Incest,
those would have run concurrent. And then the Incest
charges and the Sex Assault charges could run either way.

Q       Okay.

A       So, no, I don't believe it was dictated by
child.

Q       By child.

A       No.

Q       And in fact, the plea bargain agreement is
part of the record in case. It's a letter from you on the —

A       Yes.

Q       — Public Defender letterhead. And that
accurately reflects your understanding of the plea?

A       Correct.

58

Q       Was the plea, as to all charges, a best interest plea?

A       Yes.

Q       Did Mr. --- and did you explain to Mr. T███████ what the meaning of a best interest plea is?

A       Yes.

Q       Do you believe that he understood what that meant?

A       Absolutely. As I discussed it with him, I wrote it down and provided him a written copy of what that meant.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 23, L:21 thru p. 26, L:14)

(23)     The Court **FINDS** that the Petitioner's trial counsel also discussed her belief that the Petitioner received a good plea deal:

Q       Were you recommending to him that he take the plea?

A       Absolutely.

Q       And was that because of the large amount of time he would face should he be convicted of all the counts?

A       Yes. And this was a Rule 11(E), best

59

interest plea.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 31, L:22 thru p. 32, L:6)

(24)     The Court **FINDS** that the Petitioner's trial counsel further testified about her belief that the plea was fair for the Petitioner:

Q     Ms. French, the — the plea agreement itself, you said you believed he faced a minimum of how many years had the case gone to trial and he'd been found guilty of everything?

A     If he went to trial he was looking at a minimum of one-ten. I do not recall the maximum.

Q     Okay. So minimum of one-ten. Your — the plea that was negotiated, he was then looking at a minimum of thirty. Correct?

A     Maximum. Well, yes, I'm sorry. Under the worst case scenario the minimum was thirty. I believe the best case scenario it was fifteen.

Q     And you got him to twenty-five?

A     Correct.

Q     Okay. And this was an 11(E) plea?

A     This was.

Q     Okay. How common are 11(E) pleas in these types of cases?

60

A       Neither best interest nor 11(E) are very common in these cases.

Q       Okay. But you got him both of them?

A       Yes.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 47, L:21 thru p. 48, L:19)

(25)    The Court **FINDS** that Petitioner's trial counsel also discussed her investigation of the Petitioner's competency to stand trial and his criminal responsibility:

Q       Let's start with off with the issue relating to his mental condition. Was there concerns about his mental condition during the course of your representation?

A       I had Mr. T███████ evaluated. He was found both competent and criminally responsible, so I did check into that issue.

Q       Okay. Were there issues related to him having blackouts and other issues?

A       I specifically had asked Dr. Smith to take that into consideration. When I was reviewing the file, I believe Dr. Smith had reviewed certain neurological records that he obtained from Mr. T███████'s information.

Q       So the information that you have concerning

61

Mr. T█████'s medical history relating to the blackouts is described in Dr. Smith's evaluation?

A    Correct.

Q    And that evaluation in fact enumerates that he does have — that Mr. T█████ has a long history of this blackout condition.

A    Yes.

Q    A condition far — that came about far before he was every criminally charged with anything.

A    Correct.

Q    And in addition to that, Mr. T█████ actually was placed on disability because of an accident that had took place. Do you recall that?

A    Not off hand.

Q    Fair enough.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 18, L:17 thru p. 21, L:1)

(26)    The Court **FINDS** that the Petitioner's trial counsel further testified about these efforts:

Q    During the course of your evaluations of Mr. T█████, did it come about that he had poor intellectual functioning?

A    I never viewed him as being severely limited

62

intellectually. Again, I had him evaluated. I was a little more concerned about the blacking-out episodes that I was the mental intellectual ability. I mean, he always seemed to certainly understand what I was saying. But then again, I'm use to speaking on a certain level when I'm talking to my clients which is not at -- quite as articulate as I would if I were speaking to you.

Q I'm still trying to process your answer --

A I apologize.

Q -- in regard to -- with regard to the fact in the questionnaire he seemed to really misunderstand some core concepts relating to his plea and that you had to explain to him even again at the time of questionnaire. So did you have to explain those two to Mr. T███████ on multiple occasions?

A No, not to my knowledge.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 45, L:11 thru p. 46, L:8)

(27) The Court **FINDS** that the Petitioner's trial counsel also discussed her relationship with her client:

Q If we go to Questions Number 65, Ms. French, --

A Yes.

63

Q — here it asks, "Are you satisfied with the services your attorney has given you in this case?" It was originally marked no but changed to yes. Do you recall the circumstances of that?

A I probably asked Mr. T███████ what he thought I could do different. Clients generally want better plea offers or want the case to be dismissed and some things are simply outside of my power.

Q All right.

A But that's speculation.

Q And then he's asked, "Is there anything which he has done or which he has failed to do for you which you desire to discuss with the Court in private before your plea is accepted?" He initially marked that yes and then it was changed to no. Do you recall the circumstances of that?

A No.

Q The no — the yes and no that are written and circled, is that in his handwriting or your handwriting?

A Probably mine because anything I would have added I generally have him to initial my changes.

Q On Question 68 he asked, "Is there any question in your mind about this proceeding" -- or I'm sorry. Question 68 asks, "Is there any question in your

64

mind about this proceeding which you wish to ask before your plea is accepted?" It was initially marked yes and then changed to no. Do you recall the circumstances to that?

A       Actually 69 is marked yes.

Q       I'm sorry. 68 is what I meant. That was the one I read.

A       At that point I would have asked him what questions he had and answered his questions. So then the answer would be no.

Q       Do you recall the questions he had?

A       Oh, no. This was seven years ago at a minimal.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 32, L:12 thru p. 34, L:6)

(28)     The Court **FINDS** that at the plea hearing held on April 20, 2007, Judge Knight thoroughly reviewed the charges with the Petitioner to ensure he understood them:

THE COURT: In that representation, have you been able to sit down with a copy of the indictment and go over it with her?

THE DEFENDANT: Yes.

THE COURT: Each . . .and it's got 13 counts in it.

65

THE DEFENDANT: Yes. Yes, sir.

THE COURT: And did you discuss each and every one of those counts in that indictment with her?

THE DEFENDANT: Yes, sir.

THE COURT: And do you think you understand what those charges are?

THE DEFENDANT: Yes, sir.

THE COURT: The charges involve a number of sections of the West Virginia Code. One, two three, four, five different sections apparently.

They deal with sexual assault second degree, sexual abuse by a custodian, sexual abuse first degree, sexual assault first degree, and incest.

Do you understand that to be the charges against you?

THE DEFENDANT: Yes, sir.

THE COURT: Did you discuss those charges with her on numerous occasions?

THE DEFENDANT: Yes.

THE COUART: More than once?

THE DEFENDANT: Yes.

THE COURT: And you think you understand those charges?

THE DEFENDANT: Yes, sir.

THE COURT: You understand what the State would have to prove beyond a reasonable doubt to convict you of each one of those charges?

THE DEFENDANT: That's fine, sir.

THE COURT: Okay.

So do you have any questions that you'd like to ask me about any of those charges against you today?

THE DEFENDANT: No, sir.

(*See* Transcript of plea hearing of April 20, 2007, at p. 4, L:23 thru p. 6, L:14)

(29)     The Court **FINDS** that Judge Knight also inquired as to the Petitioner's mental status:

And Ms. French, you seen him today and you've talked to him a number of times. Does he appear any different today than he did at the time you talk to him.

MS. FRENCH: A little bit more nervous than normal but other than that, no, Your Honor.

THE COURT: Do you think he (sic) physically and mentally capable of entering a plea?

MS. FRENCH: I do, Your Honor.

THE COURT: What about you, Mr. McFadden?

MR. MCFADDEN: Yes, your Honor.

67

THE COURT: Are you on any medication?

THE DEFENDANT: Yes, sir, I'm on a lot of medication.

THE COURT: What can (sic) of medication is he on?

THE DEFENDANT: Well, I'm on, uh . . .I didn't bring my list with me.

Do you got my list, honey?

THE COURT: Well, just tell me the types. You don't have to tell me the name.

THE DEFENDANT: Well, I'm on depression medicine. I'm on nerve medicine. I'm on paid medicine, uh, I'm on medicine that helps me sleep. Uh, I'm on stomach medicine. I have to take an aspirin every day. I do believe I'm on thyroid medicine.

I'm on all kinds of different kinds of medication.

THE COURT: Any of that medicine that you're on today that you've taken today?

THE DEFENDANT: Yes, sir.

THE COURT: And is that causing you to understand what we're doing today?

THE DEFENDANT: No, sir.

THE COURT: You understand what we're doing?

THE DEFENDANT: Yes, I mean, it's made me, you know, a little drowsy and stuff.

68

THE COURT: Well, you've not taken your sleep medication this morning before you came did you?

THE DEFENDANT: No. No. No, sir.

THE COURT: You take that at night before you go to bed?

THE DEFENDANT: Yes. Yes, sir.

THE COURT: What kind of sleep medication are you on?

THE DEFENDANT: Uh, Seroquel.

And uh, I . . .see I blackout a lot and I lose my memory and when I blackout and I come to I don't know who I am or nothing.

THE COURT: How long does that last?

THE DEFENDANT: Well, she's got to answer that because I can't. I don't know.

THE COURT: I mean, do you go a long time without your memory being there, or do you retain, or you - -

THE DEFENDANT: I know - -

THE COURT: When do you find out when (sic) you are?

THE DEFENDANT: Sometimes I think it's last about 45 minutes and then when I blackout against and come to I know everything. It's very scary and I have a tendency of walking in my sleep. There's times that she's told me that I walk in my sleep and walk outside in my underwear in cold weather.

69

THE COURT: Well, you're not outside and in your underwear today so you're - -

THE DEFENDANT: No.

THE COURT: - - not walking in your sleep are you?

THE DEFENDANT: In fact, I know I'm not asleep today.

THE COURT: Okay.

All I need to know is if you pass out here today you won't have any memory of what we just got through doing, is that right?

THE DEFENDANT: I probably wouldn't remember you or none of this.

THE COURT: Okay.

THE DEFENDANT: Like I was in the hospital - - take that into consideration. You don't feel like passing out right now, do you?

THE DEFENDANT: Well, no. Not at the moment and I hope (sic) don't.

THE COURT: Okay.

THE DEFENDANT: Just like I was in the hospital, uh, for a test and while they was doing the test I blacked out. When I come to I didn't know where I was at. And I looked around and the nurse asked me said do you know where you're at. And I looked around the room and their

70

uniforms and I said well it looks like I'm in a hospital. And I didn't know what I was doing . . . .what I was there for or who. She came into the room and told me she was my fiancé. And I said oh, you're my fiancé. I mean that's just - -

THE COURT: Well, what you're telling me is that you have temporary amnesia after you passed out?

THE DEFENDANT: Yes, sir.

THE COURT: And about 45 minutes you come to yourself--

THE DEFENDANT: Yes.

THE COURT: -- again?

THE DEFENDANT: Yes, sir.

THE COURT: Okay.

THE DEFENDANT: My health is very poor.

THE COURT: Any reason today health poor, mental poor, physical poor, or whatever poor you got that you cannot enter this plea, tell me now?

THE DEFENDANT: No. It's just . . . .it's not . . .

THE COURT: This is your day in court. Do you understand that?

THE DEFENDANT: Yes, I do, sir.

71

THE COURT: And I'm sure you've been anxious every (sic) since you got indicted in this case.

THE DEFENDANT: Yes, sir.

THE COURT: About what this day would bring for you.

THE DEFENDANT: Right.

THE COURT: And I understand that. I understand being nervous and depressed over what's going on in your life. And anxious about what's going on but I just need to know whether any of that's got anything to do with not understanding anything?

THE DEFENDANT: Oh, I understand everything.

(*See* Transcript of plea hearing of April 20, 2007, at p. 6, L:23 thru p. 12, L:10)

(30) The Court **FINDS** that Petitioner's trial counsel filed a motion for discovery and obtained and reviewed the State's evidence.

(31) The Court **FINDS** that the Petitioner's trial counsel interviewed the bulk of the witnesses by phone.

(32) The Court **FINDS** that while the Petitioner's trial counsel did not interview the child victims, this rarely happens in these types of cases as the State almost universally objects to such interviews.

72

(33)  The Court **FINDS** that Petitioner's trial counsel subpoenaed Courtney Sargent, Allison Byrd, Chris Bell, Ashley Sargent, Jimmy T████, Sabrina T████, Geneva T████ G████, Kathleen Mullins, and Pam Bailey to testify on behalf of the Petitioner at trial.

(34)  The Court **FINDS** that Petitioner's trial counsel was able to negotiate a plea agreement with the State on behalf of the Petitioner which reduced his exposure to incarceration from one hundred and twenty-one (121) years to two hundred and eighty (280) years to forty-six (46) years to one hundred and fifteen (115) years, and that in fact, the Petitioner's actual sentence was twenty-five (25) years to sixty (60) years.

(35)  The Court **FINDS** that the Petitioner's complaint appears to be that he thought he would be eligible for parole after fifteen (15) years.

(36)  The Court **FINDS** that Petitioner's trial counsel had the Petitioner evaluated for both competency to stand trial and criminal responsibility by Charleston Psychiatric Group, who opined that he was both competent to stand trial and criminally responsible:

> ASSESSMENT AND OPINION: The defendant has recurrent depression which has been exacerbated due to the current charges. He has never had psychotic disturbance. Although the IQ score is in the mentally retarded range, his life functioning would place him at least in the

73

borderline range. He has a number of physical conditions annotated in the medical records, including chronic obstructive pulmonary disease, heart disease, and some type of syncope/seizure disorder.

In our opinion, the defendant is competent to stand trial. He has adequate memory, reasoning ability, appreciation of the proceedings against him, and understands the role and function of courtroom participants, the charges against him and the possible penalty. He has the capacity to assist his attorney in his own defense.

We also opine that the defendant was criminally responsible for his acts at the time of the alleged crimes. He did not have any mental disease or defect which would have prevented him from appreciating the wrongfulness of his acts, nor which would have prevented him from conforming his acts to the requirements of law.

Whether or not he has any pedophilia or other paraphilia would have to be determined from a pre-sentence type of evaluation.

(Report of Charleston Psychiatric Group, Inc., dated April 5, 2007, and attached to the Petitioner's Memorandum in Support of Amended Petition for Writ of Habeas Corpus as Exhibit 15.)

(37)    The Court **FINDS** that the trial court made proper enquiry as to the Petitioner's mental status at the time of the plea, and correctly believed him to be competent to enter this plea.

(38)    The Court **FINDS** that there was no reasonable basis for Petitioner's trial counsel to suspect that the Petitioner was not capable of cooperating with him, was incompetent to stand trial, or was not criminally responsible for his actions.

74

(39) The Court **FINDS** that the Petitioner has failed to prove that he was not competent at the time of the crime, not competent at the time of the trial, or to support his claim of incompetence at the time of the offense, as opposed to the time of the trial.

(40) The Court **FINDS** that the Petitioner's trial counsel subpoenaed witnesses to testify at the trial.

(41) The Court **FINDS** that Petitioner's trial counsel more than adequately investigated and prepared the Petitioner's case for trial.

(42) The Court **FINDS**, given the circumstances of this case, the Petitioner's trial counsel achieved a masterful result for her client in that she:

    (a) Got her client a plea which allowed him to plead to six (6) felonies when charged with thirteen (13);

    (b) Saw him sentenced for a period which was roughly 20% of his maximum exposure;

(43) The Court **FINDS** that trial counsel's performance was more than adequate under an objective standard of reasonableness.

(44) The Court **FINDS** that, even if trial counsel made unprofessional errors (which she did not), the result of the proceedings would not have been different.

75

(45) The Court **FINDS** and concludes that the Petitioner has failed

to prove that his trial counsel was ineffective by a

preponderance of the evidence.

(46)     The Court **FINDS** and concludes that the Petitioner's claim

that he received ineffective assistance of counsel is without

merit.


## 2. WAS THE PETITIONER'S GUILTY PLEA KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY MADE?

**a.  Petitioner's Argument:**

THE GUILTY PLEA WAS NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY MADE.

Mr. T█████'s mental state prevented the entry of knowing, intelligent and

voluntary plea as described above.  Further, his poor intellectual ability including near

illiteracy also prevented such a plea.  (Ex. 12 at 27).  This intellectual deficit was

confirmed in his psychiatric assessments wherein he was described as having: a

"marginal" common sense knowledge base (Ex. 14 at 3), borderline verbal IQ,

extremely low performance and full scale IQ, a 3.8 grade level reading, a 2.1 grade

level spelling, and a 4.3 grade level of sentence comprehension (Ex. 15 at 5-6), and

intellectual functioning in the mild mentally retarded range (Ex. 15 at 8).

The West Virginia Supreme Court of Appeals has held that the state and

federal constitutions mandate that all plea agreements be knowingly, intelligently and

voluntarily made. E.g., *State ex rel. Gill v. Irons*, 207 W.Va. 199, 202, 530 S.E.2d

460, 463 (2000).  A plea cannot be knowingly, intelligently, and voluntarily made if

the defendant is not fully informed and fully capable of accessing and processing the

information needed to weigh the nature and consequences of the plea. Here, Mr.

T█████'s well-documented mental illness and poor intellectual functioning

prevented a plea that was knowingly, intelligently and voluntarily made.

**b. The Respondent's Response:**

The State's response is included in its Response to III.c.1, above.

**c. Finding of Fact and Conclusions of Law:**

(1) The Court **FINDS** that the West Virginia Supreme Court of Appeals has held

that:

> A direct appeal from a criminal conviction based on
> a guilty plea will lie where an issue is raised as to
> the voluntariness of the guilty plea or the legality of
> the sentence.
> *State v. Sims*, 162 W. Va. 212, 248 S.E.2d 834, W.
> Va. 1978). Syl. pt. 1

(2) The Court **FINDS** that the West Virginia Supreme Court of Appeals also held

in *Sims* that:

> The controlling test as to the voluntariness of a
> guilty plea, when it is attacked either on a direct
> appeal or in a habeas corpus proceeding on grounds
> that fall within those on which counsel might
> reasonably be expected to advise, is the competency
> of the advice given by counsel. Syl. pt. 2.

(3) The Court **FINDS** that the West Virginia Supreme Court of Appeals also held

in *Sims* that:

> Before a guilty plea will be set aside based on the
> fact that the defendant was incompetently advised,
> it must be shown that (1) counsel did act
> incompetently; (2) the incompetency must relate to
> a matter which would have substantially affected

77

the fact-finding process if the case had proceeded to trial; (3) the guilty plea must have been motivated by this error. Syl. pt. 3.

(4) The Court **READOPTS** all of its relevant findings made in III.C.1.c., *infra.*, as is fully set forth herein.

(5) The Court **FINDS** that the Petitioner testified that his plea was involuntary at his omnibus habeas corpus hearing:

Q    Now you have always asserted your innocense of these charges.

A    And always will.

Q    Why are you asserting your innocense(sic)?

A    Because I didn't do this.

Q    But you plead guilty, sir, to a charge that could — that you could receive thirty to seventy years in prison on and did receive twenty-five to fifty-five years in prison on.

A    Yes, I did.

Q    When you were — when you decided to take that plea, did you have any idea that you were facing a sentence that lengthy?

A    No, I did not.

Q    What did you think was going to happen to you, Mr. T███████?

A    Well, I wanted to get re-remarried and I

78

figured I'd just take this plea and get the time over with, you know, and get married again.

Now my fiancé she got killed in a car accident so she's not around anymore.

Q But did you think you were going to be spending twenty-five to fifty-five years in prison?

A I did not, sir.

Q And you were making these plans to remarry --

A Yes.

Q -- in the midst of entering this plea. Is that right?

A Yes.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 55, L:18 thru p. 56, L:23)

(6) The Court **FINDS** that the Petitioner also testified to this as follows:

Q Now with this plea bargain, you heard Ms. French say today that, based on her knowledge and experience she expected you to receive the maximum of a thirty year to seventy year sentence. Did she ever convey that to you?

A No, she did not. But she did tell me if I

79

did take this plea I maybe to come up for parole within fifteen years.

Q    And is that what you were hoping would happen?

A    That's what I was hoping that would happen.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 58, L:11 - 21)

(7) The Court **FINDS** that the Petitioner also stated the following about the involuntariness of his plea:

Q    With regard to the involuntary guilty plea, are you alleging that the plea was involuntary because you didn't know all the facts of your case?

A    That is true.

Q    And also because of the fact you had difficulty understanding everything?

A    That's true too.

Q    And because of your belief that you were going to receive probation after fifteen years?

A    Yes, sir.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 68, L:23 thru p. 69, L:9)

80

(8) The Court **FINDS** that Petitioner's trial counsel addressed the voluntariness of the Petitioner's plea at the omnibus habeas corpus hearing:

Q      You filled out the plea bargain paperwork with Mr. T███████ as well?

A      Correct.

Q   .  Did you write that or did he write it?

A      May I see the petition.

MR. CASSELL: Your Honor, if I approach?

THE COURT: Sure.

BY MR. CASSELL:

Q      I have photocopies of them, Ms. French.

A      It appears that I have followed my standard procedure in going over the plea paperwork.

Q      Okay. And did you write in the answers for him then?

A      I go over the first sheet and the actual Plea of Guilty with the client. And I read each question out and I write down the client's response.

The petition itself — or the — excuse me — the Questionnaire To Support the Petition, I always have the Defendant to complete that paperwork while sitting with

81

me in my office so that if he or she has any questions, those questions may be asked and answered promptly.

Q      So I take from what you're saying, the Plea of Guilty form that I'm showing you now —

A      Correct.

Q      — you wrote the answers in for Mr. T███████ on that?

A      Correct.

Q      And the Petition to Enter the Plea of Guilty, Mr. T██████ wrote with your assistance?

A      Yes.

Q      And that Statement in Support of Guilty Plea, Mr. T██████ wrote with your assistance?

A      No. The Petition — I'm sorry. The Petition and the Plea of Guilty, I would have written the answers. And the Statement in Support would have been completed by Mr. T██████.

Q      Okay.

A      I do the first and the last sheet. The yellow sheets are completed by the client.

Q      All right. In this case did you have to deviate from your standard practice to where

82

Mr. T███████ actually had to have you write in some of the answers on the Statement in Support of the Guilty Plea?

A    I do not recall.

Q    All right. Let me show you that and see if you recognize your handwriting on any of that form.

THE COURT: Do you want the originals? I have the original file up here if you want it.

MR. CASSELL: If she can't tell —

THE WITNESS: Oh, please.

BY MR. CASSELL:

Q    Would that make it easier?

A    Yeah, that would make it easier.

Q    Sure. I'm now handing you the original document. Does that help you to determine if any of that — and I'm showing you the Statement in Support of Guilty Plea. Is any of that — some of that in your handwriting, Ms. French?

A    It must be because it appears that I had Mr. T███████ to initial anything that I wrote in addition to what he wrote.

Q    So that deviates from your standard practice. Is that right?

A    Not necessarily.

83

Q        Okay. I misunderstood you.

A        Some clients with multiple charges of this nature may not write everything down correctly. I mean, for instance, best interest plea of guilty and he didn't write out the numbers. That would be something that I would add if the client failed to because they don't necessarily know what counts number-wise they are pleading to.

Q        If you turn to the second page of that document, Questions 18 and 19.

A        Yes.

Q        Did Mr. T███████ reflect the issues you were having with regard to mental illness?

A        He did. He wrote in yes, and I questioned him further about why the answer was yes. The question itself is merely, "Have you been treated at any time for mental illness," which he answered appropriately. I usually just go a little bit further and clarify for Court's benefit.

Q        And Question 19 is, "Are you under treatment now?" And what was his response?

A        "For depression, blocking out, losing memory."

Q        Does it say blocking out or blacking out, do you think?

A     I'm sorry. That's probably blacking out.

Q     Okay. Now as we go to Question Number 41 on that same document.

A     Yes.

Q     Now there's an answer there that I think was marked out.

A     Yes.

Q     So the question was, "Except as shown by your plea bargain, if any, filed" — "has anyone threatened you with denial of probation, or a more severer sentence or with prosecution for some other offense" -- "or harm or injury to your person or property if you plead not guilty, or" -- "by" -- "means coerced you, scared you, forced you or otherwise to cause you to pled guilty?" And he wrote — looks like initially he wrote, "Because my lawyer said it would be in my best interest to."

A     It appears that in both questions, 40 and 41, Mr. T███████ was under the impression that he was both being promised something and being threatened at the same time to enter into the plea.

Q     All right. What do you recall — do you recall a discussion with him regarding those questions?

A     No.

85

Q Do you recall what he felt was being promised in Question 40?

A No, I do not.

Q Do you recall what he thought he was being threatened with in Question 41?

A I can only speculate that it was a greater sentence should he go to trial.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 26, L:15 thru p. 31, L:21)

(9) The Court **FINDS** that the Petitioner's trial counsel also testified about the voluntariness of the plea as follows:

Q Now the plea itself, did Mr. T███████ enter this plea because that's what he wanted to do?

A Absolutely.

Q Did you force him to take that plea in any way, shape or form?

A I did not.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 48, L:20 thru p. 49, L:2)

(10) The Court **FINDS** that Ms. French further testified as follows:

Q To the best of your recollection, and based

86

on your common practices over your years of experience, do you believe Mr. T███████ understood what he was doing at the time he entered the plea?

A    Absolutely.

(*See* Transcript of Omnibus Habeas Corpus hearing of August 13, 2014, at p. 49, L:15 - 19)

(11)    The Court **FINDS** that Judge Knight extensively reviewed the voluntariness of the Petitioner's plea during the plea colloquy:

THE COURT:  One, do you understand all these charges against you?

THE DEFENDANT:  Yes, sir.

THE COURT:  Are you doing it freely and voluntarily?

THE DEFENDANT:  Yes, sir.

THE COURT:  With full understanding of what could happen to you?

THE DEFENDANT:  Yes, sir.

THE COURT:  And nobody's forced you or threatened you to do it?

THE DEFENDANT:  No.

THE COURT:  And nobody's promised you anything other than what's in this plea agreement.  Those are the things that we've got to find out today.

THE DEFENDANT: No, sir.

THE COURT: In this hearing.

THE DEFENDANT: Yes, sir.

(*See* Transcript of plea hearing of April 20, 2007, at p. 2,

L:9 thru p. 3, L:6)

Also;

THE COURT: And you're not involuntarily.

THE DEFENDANT: I'm doing it voluntarily.

THE COURT: Nobody here has tried to force you into

ding this plea have they?

THE DEFENDANT: No, sir.

THE COURT: Ms. French didn't say you had to do this or

things would get worse for you?

THE DEFENDANT: No, sir.

THE COURT: Mr. McFadden didn't do that either?

THE DEFENDANT: No, sir.

THE COURT: Your fiancé hadn't done that to you?

THE DEFENDANT: No.

THE COURT: You're doing it because - - I know that you

don't want to, you'd rather not be here. Rather - -

THE DEFENDANT: That's true.

THE COURT: - - not to have this happen.

THE DEFENDANT: That's true, sir.

THE COURT; But since you are here this is what you want to do today - -

THE DEFENDANT: Yes, sir.

THE COURT: - - because you are here, is that right?

THE DEFENDANT: Yes.

(*See* Transcript of plea hearing of April 20, 2007, at p. 12, L:11 thru p.13, L:13)

Also;

THE DEFENDANT: Yes, sir.

THE COURT: Under the circumstance. Because this is the way you want to do rather than stand trial on all 13 counts of the indictment there, right?

THE DEFENDANT: Yes.

THE COURT: Is that what you want to do?

THE DEFENDANT: Yes, Sir.

THE COURT: That's called a best interest plea because you believe it's in your best interest, do you? Under these circumstances. I know that it's not in your best interest overall but it's in your interest under this indictment. Do --

THE DEFENDANT: Yes, sir.

THE COURT: - - you understand that?

THE DEFENDANT: Yes, sir.

89

THE COURT: Uh, and then the rest of it is simply telling you basically what I just got through telling you except before you can get parole you know that you've got to undergo sexual evaluation. As a sexual offender if you ever get parole and get out you'd have to stay registered every where you go, every where you live for the rest of your life.

Do you understand that?

THE DEFENDANT: Yes, sir. And I told my attorney I would do anything that it takes you know.

(*See* Transcript of plea hearing of April 20, 2007, at p. 19, L:24 thru p. 21, L:2)

Also,

THE COURT: Do you think he understands and completely all the complicated measures involved in this sentencing procedure?

MS. FRENCH: We've spent three appointments just going over the plea. And the actual paperwork was about four hours yesterday going over the plea. And the actual paperwork was about four hours yesterday going over absolutely every bit of it and I made sure that he understood all the nuances of this plea before he left my office.

90

THE COURT: Do you agree, Mr. McFadden?

MR. MCFADDEN: Yes, your Honor.

THE COURT: I know by coming to Court, being down there, being up here, that what most clients think about is how much am I going to get out of this. And you're in danger of getting a lot out of it.

Do you understand that?

THE DEFENDANT: I do understand that, sir.

THE COURT: And you still want to do that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you want me to accept this plea agreement and then follow through with the rest of these pleadings today?

THE DEFENDANT: Yes, sir.

THE COURT: Alright.

I'll tentatively accept the plea agreement and go along with the agreement that you all established here under 11e and put them in clusters like this. And we'll see what happens otherwise.

THE DEFENDANT: But, Your Honor, uh - -

(*See* Transcript of plea hearing of April 20, 2007, at p. 22, L:12 thru p. 23, L:18)

Also,

91

We won't let you just walk in here and plea guilty. You understand that? You can't knock on the door, come in and say I want to plea guilty.

THE DEFENDANT: Yes, sir.

THE COURT: You've got to file a written petition with me that says please, Judge, let me plea guilty.

Do you understand that?

THE DEFENDANT: Right. Right.

THE COURT: That's like . . .that's like being in school and asking the teacher if you can go to the restroom.

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand?

THE DEFENDANT: Yes.

THE COURT: What you're asking me is the opportunity for you to plea with me for me to send you to the penitentiary. Odd as it sounds, that's what it is.

THE DEFENDANT: Yes.

THE COURT: That's all the petition is is asking somebody to do something for you.

Did you go over this form with your attorney? I have it here in front of me.

THE DEFENDANT: Yes, sir.

THE COURT: There's handwriting on this form. Filling in blanks. A whole lot of handwriting on the side where they put down the number of charges against you and things of that nature. Whose handwriting is that?

THE DEFENDANT: Well, some of it's my attorney's because I'm not too good of a writer.

THE COURT: Is any of this yours?

THE DEFENDANT: Yes.

THE COURT: Some of it's yours, is that right, Ms. French?

MS. FRENCH: That's correct, Your Honor.

THE COURT: Okay.

And some of it's hers?

THE DEFENDANT: Yes sir.

(*See* Transcript of plea hearing of April 20, 2007, at p. 25, L:18 thru p. 27, L:9)

Also,

THE COURT: However if you enter a plea today you're giving away all of those defenses because you under oath are going to be the only witness the State has in this proceeding and you're going to tell us under oath that you are guilty.

Do you understand that?

93

THE DEFENDANT: Yes, sir.

THE COURT: And you have to do it freely and voluntarily.

You understand that?

THE DEFENDANT: Yes.

THE COURT: You have to do it full knowledge and understanding of what you're doing.

You understand that, don't you?

THE DEFENDANT: Yes, sir, I do.

THE COURT: And that nobody has made any promises to you other than what's put down here. An nobody threatened you in any way to make you do it.

THE DEFENDANT: That's right. They didn't.

THE COURT: So you, under oath, I'll ask you did you understand everything in this form - -

THE DEFENDANT: Yes, sir.

THE COURT: And you went . . .you went through it with your attorneys present?

THE DEFENDANT: Yes, sir.

THE COURT: Took a long time to do it?

THE DEFENDANT: Yes, sir.

THE COURT: If you had any questions about it they were there available to answer them for you, is that right?

94

THE DEFENDANT: That's correct.

THE COURT: Now, do you have anything that you'd like to ask me about that form that tells you more eloquently than I just did about what we . . .about what you're rights are?

THE DEFENDANT: No, sir, I don't have any questions.

THE COURT: Alright, then file that form.

Now that form is not enough. You've got to have another gold form here where you go through a whole series of questions. About 73 of them.

Handwriting on that. Some of it's yours or all of it is yours?

THE DEFENDANT: Some of it's mine. Some of it's my attorney's.

THE COURT: Okay.

And as you went through this form were they present with you?

THE DEFENDANT: Yes.

THE COURT: And as you went through each question on here if you had any question about what that mean were they there present and able to answer it for you?

THE DEFENDANT: Yes.

95

THE COURT: Have any thing that you'd like to ask me about that form?

That's just a backup to what we just go through talking about. Same old deal again. Always same deal. Voluntarily doing it and know what I'm doing. Know what can happen to me and no one's forcing me or gave me any other promises.

THE DEFENDANT: No.

THE COURT: So after today if you plea guilty all you've got left is to go to the West Virginia Supreme Court and say I did not understand what was going on.

Are you understanding what is going on?

THE DEFENDANT: Yes, sir, I do.

THE COURT: I was not physically and mentally capable today to do that?

THE DEFENDANT: Yes, I am, sir.

THE COURT: I didn't know what they could send me to jail for.

Do you know what it is?

THE DEFENDANT: Yes, sir.

THE COURT: I had some other promise. Did you have any other promise that we haven't talked about here today?

THE DEFENDANT: No, sir.

THE COURT: Or uh, somebody threatened me.

THE DEFENDANT: Nope.

THE COURT: Nobody's threatened you.

So see you're left with all those things under oath that you just go through and answer to me so it doesn't leave you much of any chance.

Do you understand that?

THE DEFENDANT: Yes, sir, I do.

(See Transcript of plea hearing of April 20, 2007, at p. 29, L:19 thru p. 33, L:14)

Also,

Alright, Mr. T█████, last chance. I have your guilty plea here in front of me written out with your signature on it.

THE DEFENDANT: Yes.

THE COURT: Do you want me to accept it?

THE DEFENDANT: Yes, sir.

THE COUART: Okay.

(See Transcript of plea hearing of April 20, 2007, at p. 37, L:4 - 11)

Also,

(12)    The Court FINDS for the grounds set out above that the Petitioner received competent advice from his trial counsel.

(13)  The Court **FINDS** and concludes that the Petitioner has failed to produce any evidence sufficient to prove by a preponderance of the evidence that his plea was not knowingly, voluntary, and intelligently made.

(14)  The Court **FINDS** and concludes that the Petitioner's claim that his plea was not knowingly, voluntarily, and intelligently made is without merit.

## 3. DID THE PETITIONER RECEIVE A DISPROPORTIONATE SENTENCE?[4]

### a. The Petitioner's Argument:

**PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED BY HIS DISPROPORTIONATE SENTENCE**

Mr. T███████ received an effective sentence of 25-55 years. This is, in reality, a life sentence for Mr. T██████. This sentence far exceeds many sentences for outright murder in Mercer County and represents an incredibly harsh sentence for the crimes allegedly committed.

According to the West Virginia Supreme Court of Appeals, "[b]oth the United States Constitution and the West Virginia Constitution prohibit sentences which are disproportionate to the crimes committed." *E.g., State v. Richardson*, 214 W.Va. 410, 413, 589 S.E.2d 552, 555 (2003). The Supreme Court of Appeals has established a two stage analysis for determining if a sentence is disproportionate. First, the subjective test is analyzed. According to the *Cooper* court, "[p]unishment may be

---

[4] The Court has also addressed the Petitioner's grounds of unfulfilled plea bargain, severer sentence than expected, excessive sentence, mistaken advice of counsel as to parole or probation eligibility, and amount of time served on sentence, credit for time served, in this section.

constitutionally impermissible...if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity..." *State v. Cooper*, 172 W.Va. 266, 304 S.E.2d 851 (1983) at Syll. Pt. 5. If the sentence does not shock the conscience of the court, then the second objective test is evaluated. In that test, numerous factors are examined to determine if the sentence is disproportionate. Factors to be considered include the age of the defendant, prior record of the defendant, rehabilitative potential (including post arrest conduct, age and maturity), statements of the victim, evaluations made in anticipation of sentencing, and remorse of the defendant. *Id.* at 271-272, 856; *see also State v. Booth*, 224 W.Va. 307, 314, 685 S.E.2d 701, 708 (2009). Sentences within legal guidelines can transgress the proportionality principles. *E.g. State v. David*, 214 W.Va. 167, 177, 588 S.E.2d 156, 166 (2003), *State v. Richardson*, 214 W.Va. 410, 413, 589 S.E.2d 552, 555 (2003), *c.f. State v. Slater*, 222 W.Va. 499, 665 S.E.2d 674 (2008). Disproportionate sentence issues are appropriate for a *habeas corpus* petition. *E.g., State ex rel. Hatcher v. McBride*, 221 W.Va. 760, 656 S.E.2d 789 (2007).

The sentence in this case should shock the conscience of the court. If not, factors concerning Mr. T█████'s family history (including being a victim of sexual abuse), mental issues, and lack of prior conviction concerning children, support a finding that the sentence is disproportionate along with the excessive nature of the sentence imposed.

b. **The State's Response:**

DISPROPORTIONATE SENTENCE

99

The State also disputed the Petitioner's contention that the Petitioner's sentence was disproportionate under the State and Federal Constitutions. The Petitioner was sentenced to 25-55 years. The sentence was well within the statute and, given the seriousness of the crimes for which he was entering the plea, does not shock the conscience or offend fundamental notions of human dignity.

**c. Findings of Fact and Conclusions of Law:**

(1) The Court **FINDS** that the trial court's sentence was within statutory limits and was not based on impermissible factors. *State v. Goodnight*, 169 W. Va. 366, 287 S.E.2d 504 (W. Va. 1981) at syl. Pt. 4, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

(2) The Court **FINDS** that sentences which are within the statutory limits are not entitled to statutory review. *State v. Koon*, 190 W. Va. 632, 440 S.E.2d 442 (1993).

(3) The Court **FINDS** that, while constitutional proportionality standards theoretically can apply to any criminal sentence, they are basically applicable to those sentences where there is either no fixed maximum set by or where there is a life recidivist statute. *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 276 S.E.2d 205 (1981). at syl. Pt. 4. The sentences in this action are not of either type.

(4) The Court **FINDS** that the Petitioner testified about his sentence at the omnibus habeas corpus hearing as follows:

Q       With regard to consecutive sentences for the

100

(9) The Court **FINDS** that the Petitioner testified about his claim on the amount of time served and sentencing credit:

> Q  Amount of time served, credit for time
>
> served, did you receive any credit for your home confinement time?
>
> A  No, sir.
>
> (*See* Transcript of Omnibus Habeas Corpus hearing of
>
> August 13, 2014, at p. 74, L:9 - 12)

(10) The Court **FINDS** that Petitioner's trial counsel testified extensively about discussing sentencing with the Petitioner:

> Q  When you recommended to Mr. T▮▮▮ to take
>
> this plea, it's my understanding that the worst case scenario if the Judge
>
> accepted the 11-(E)1( C) was that he'd receive a sentence of thirty to
>
> seventy years, an indeterminate sentence. Is that correct with your
>
> memory?
>
> A  I believe so.
>
> Q  And Mr. T▮▮▮ in fact did receive a
>
> sentence of twenty-five to fifty-five years?
>
> A  Correct.
>
> Q  When you recommended that Mr. T▮▮▮ accept
>
> this plea with regard to the case, did you discuss with him what you
>
> thought the likely outcome from sentencing with be from the Judge?
>
> A  I wrote out, again, as I discussed it with

103

Mr. T████ when we were contemplating entering into this plea. I wrote out his best case scenario using that very language, and his worst case scenario. I did not write out intermediate case scenario.

I also told him quite bluntly that I did not expect him to get probation, but I did not speculate as to whether the Court would run those charges consecutive or concurrent.

I usually tell my clients to prepare for the worst case scenario.

Q    Do you recall telling Mr. T████ that specifically?

A    Yes. Well, no, not necessarily. Let me retract that, but it's something that I would say. I certainly —

Q    Given — given — Ms. French, how long have you been practicing criminal law?

A    Since 1997.

Q    And this case involved three juvenile victims. Correct?

A.    Yes.

Q    Multiple counts with regard to those victims?

A    Yes.

Q    Given that scenario and your experience as a criminal defense attorney and knowing the Mercer County Court System as you do, would you expect Mr. T████ receive a light sentence for such a best interest plea?

104

A    Absolutely not.

Q    What would be your expectation? What would you expect if you were asked to guess what would happen?

A    Worst case scenario.

Q    So when you recommended this plea to Mr. T█████, in your mind, based on your experience and knowledge of the system, your knowledge of the Courts and the judges that operate, you would have expected him to receive a thirty to seventy year sentence?

A    Correct.

Q    Did you ever convey that to him?

A    I do not know if I did or not, however I did probably tell him to expect the worst. And my notes certainly indicate that I wrote out what his worst case scenario would be.

Q    Do you think Mr. T█████ comprehended the fact that he was going to receive — that you expected him to receive a sentence that long?

A    I went over the plea negotiations quite extensively with Mr. T█████. He certainly seemed to appreciate the seriousness of what he was doing. So there was nothing to make me think that he was operating under any false exceptions that would lead him to think that certain outcomes would be possible, you know, such as probation.

105

Clients always want probation and that would have been his best case scenario technically. However, I let him know that under no circumstances would that occur.

Q    Was Mr. T████ discussing with you getting divorced and remarried?

A    I believe — I don't recall any specific conversation. In scanning the file I did see some notes. I believe her name was Helen, if I'm correct, and there was a great deal of animosity that was apparent. And he had a girlfriend, someone other than Helen that he was with at the time that this was going on, the trial/plea, et cetera. So I imagine that would be accurate.

THE COURT: Let me interject here. We need to get him to waive the attorney/client privilege.

MR. CASSELL: We can, Your Honor. Obviously we're raising ineffective assistance of counsel so I think it is waived.

THE COURT: Okay. Now Mr. T████, you understand now that your lawyer is asking Ms. French questions that are within — protected because when you talked to her about these things it was protected by the attorney/client privilege. Do you understand that?

THE PETITIONER: I understand.

THE COURT: All right. Now when he starts saying — when you start say she didn't do a good job, that means he's got to ask questions and the State has to ask questions that require them to put you in a position of having to

106

answer them. So you understand that now? You give up your

attorney/client privilege with her?

THE PETITIONER: Yes.

THE COURT: All right. Go ahead.

MR. CASSELL: And Your Honor, just for the record, I discussed that

with him previously.

THE COURT: Okay.

BY MR. CASSELL:

Q       At the time of entering the plea, did you

advise the Court about the fact he planning on getting remarried and ask

the Court to delay sentencing so that he could do that?

A       I do not recall.

Q       Would that cause you pause that he's making plans for his future

life given the fact that you think he's going to serve a thirty to seventy

year sentence as to whether he understands what's likely to happen to

him?

A    .  Clients do odd things.

(*See* Transcript of Omnibus Habeas Corpus hearing of

August 13, 2014, at p. 35, L:23 thru p. 41, L:2)

(11) The Court **FINDS** that Judge Knight reviewed potential sentences with the

Petitioner during the plea hearing:

107

THE COURT: Now this agreement has got a number of things in it that I need to talk to you about. You understand that you're going to plea guilty to six felony counts in this indictment?

THE DEFENDANT: Yes, sir.

THE COURT: Everyone (sic) of those felony counts carry time in the penitentiary in the State of West Virginia.

THE DEFENDANT: Yes, sir.

THE COURT: Serious time, do you understand that?

THE DEFENDANT: I do understand that.

THE COURT: For example in this plea agreement that you signed it says that Count Number One which charges you with sexual assault in the second degree carries a sentence of not less than ten nor more than 25 years in the penitentiary in the State of West Virginia.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And it also, the Court can impose a fine of $1000 and not more $10,000.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And then on Count Number Three which is sexual abuse first degree it carries time in the penitentiary of not less than one nor more than five years and a fine up to $10,000.

Do you understand that?

108

THE DEFENDANT: Yes, sir.

THE COURT: Count 4 and 6 are the same. They are sexual abuse by custodian and that carries time in the penitentiary of not less than ten years nor more than 20 year.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And a fine of not less 5, more than $5000.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Now on Count Five, sexual assault in the first degree it carries time in the penitentiary of not less than 15 nor more than 35, at the Court's discretion a fine of $100 to $15000.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And then on Count Seven which is incest it carries time in the penitentiary in the State of West Virginia five to 15 years and at the Court's discretion a fine of $500 to $5000.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Now each one of those the worse (sic) possible thing that could happen to you is if I stacked every one of them on top of each other. Do you understand that?

THE DEFENDANT: Yes, sir.

109

THE COURT: You have to pull Count One before you could ever go the next count and pull it and have to go to the next count and pull it and the next up the line. Now that's not the agreement you but I mean that the worse (sic) thing that could happen to you if you were just coming into Court and just pleading to six counts of the indictment.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: But you made an agreement also that the Court's here or the prosecutor's office has agreed that the State recommends that they are going to dismiss all the other counts and here's what they want to do under 11E1c says and this is what it says:

That Counts Number 1, 3, and 5 to run concurrent, in other words in the same group together. Counts 1, 3, and 5 will be the first group you're going to plea to. And 1, 3, and 5 under this agreement one is sexual assault in the second degree. Three is sexual abuse in the first degree and Five is sexual abuse by a custodian. And those three, the agreement is that 1, 3, and 5 those first three counts that you're going to plea to of this six count indictment that you run it concurrently one with the other.

Do you understand that?

THE DEFENDANT: *No audible response.*

THE COURT: And then the next two counts that you plea to . . .plea guilty to is sexual abuse by custodian that four and six. Counts 4 and 6

110

that are contained in the indictment. On a yeah, sexual let's see. Not four and six.

MS. FRENCH: Four and six are sexual abuse by a custodian.

THE COURT: Oh, yeah. Okay. Sexual abuse by custodian. This is all down together.

MS. FRENCH: Count 5 was sexual assault first degree.

THE COURT: Okay.

MS. FRENCH: And it runs together with one and three.

THE COURT: Yeah.

MS. FRENCH: Okay.

THE COURT: You got them out of order when you stuck them together and I couldn't keep up with them.

MS. FRENCH: My apologizes (sic).

THE COURT: So anyway that's uh, yeah, Six is sexual assault in the first degree, three is sexual abuse in the first degree and one is sexual assault in the second degree.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And five is uh, yeah five is sexual assault in the first degree. So they're going to lump those three together and then we're going to lump the next two together.

Do you understand that?

THE DEFENDANT: Yes, sir.

111

THE COURT: And then the last thing which is in seven so it's going to be your sixth plea. It runs by itself. It hasn't got anything to be lumped together with.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: So there are three things here that are lumped together. If I accept this plea we'll have them all run concurrent but there's no plea agreement about whether they run concurrent with each other or consecutive to one another. So if we accept this plea agreement what could happen to you today is that you could have three sets of things to pull in the penitentiary which means you start the first set and have to get it completely pulled before you ever start pulling the second set. Get it completely pulled before you start performing the third set.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: That's your understanding of the agreement?

THE DEFENDANT: Yes, sir.

THE COURT: Okay.

Now, I'm not saying that's what's going to happen to you. I don't' know what's going to happen to you yet.

Do you understand that?

THE DEFENDANT: Yeah.

112

THE COURT: I'm not judging what's happening to you. I'm just seeing whether I'm willing to accept the . . .what you all's understanding under 11e is at the present time.

THE DEFENDANT: Yes, sir.

(*See* Transcript of plea hearing of April 20, 2007, at p. 13, L:14 thru p. 19, L:20)

Also,

THE COURT: We're getting three cloisters of cases against you which run with varying sentences.

Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: Three to be clumped together. They run from ten to 25, uh, let's see, is that the most serious, ten to 25?

MS. FRENCH: Fifteen to 35.

THE COURT: Fifteen to 35. Fifteen to - -

MS. FRENCH: Ten to 20.

THE COURT: - - thirty-five.

So you've got anywhere . . .the different sentences there, like the worse (sic) is the 15 to 35 sentence.

Do you understand that? It's an indeterminate sentence.

THE DEFENDANT: Yes, sir.

113

(*See* Transcript of plea hearing of April 20, 2007, at p. 21,

L:18 thru p. 22, L:11)

(12) The Court **FINDS** that Judge Knight set forth his rationale for sentencing the Petitioner at the sentencing hearing held on June 27, 2007:

> You're not a fit and proper subject I don't believe for probation in any way. I sent you up for a sexual assessment. I read your sexual assessment. All you wanted to do was deny everything that was going on. You have these blackouts whenever you have any of these seizures and you're now, er, any of these crimes that you committed that you pled guilty to and you're trying to have one of them today in Court and I don't believe you're having me (sic) at all. You know exactly what's going on. I read the letter that was sent in on your behalf uh, from the uh, from the woman that you're living with at the present time. And I don't believe that's any reason to set it aside so it is the judgment of the Court that you serve all of these sentences in the penitentiary in the manner in which they're assigned.
>
> (*See* Transcript of sentencing hearing of June 27, 2007, at
>
> p. 5, L:17 thru p. 6, L:12)

(13) The Court **FINDS** and concludes that the Petitioner did not receive consecutive sentences for the same transaction.

(14) The Court **FINDS** and concludes that the Petitioner did not receive a severer sentence than expected.

114

(15) The Court **FINDS** and concludes that the Petitioner did not receive disproportionate sentences.

(16) The Court **FINDS** that, pursuant to W. Va. Code, 62-11B-11(b), it is in the court's discretion whether or not to apply pre-trial home confinement time as a credit towards a criminal defendant's sentence.[5]

(17) The Court **FINDS** that the Petitioner was fully aware at the time of his plea that he could receive an effective sentence of twenty-five (25) to sixty (60) years.

(18) The Court **FINDS** that the Petitioner was sentenced for six (6) felonies when he could have been tried and found guilty of thirteen (13).

(19) The Court **FINDS** and concludes that the Petitioner has failed to prove by a preponderance of the evidence that he received a disproportionate sentence.

(20) The Court **FINDS** and concludes that the Petitioner's claim that he received a disproportionate sentence is without merit.

## 4. WHETHER THE PETITIONER'S STATE AND FEDERAL CONSTITUIONAL RIGHTS WERE VIOLATED BY AN INADEQUATE INDICTMENT

a. **The Petitioner's Argument:**

**PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE INADEQUATE INDICTMENT**

The West Virginia Supreme Court of Appeals has recently reviewed the Constitutional requirements for indictments:

---

[5] Upon conviction of a person, the Circuit Court, Magistrate Court or Municipal Court may, in its discretion, grant credit for time spent on home incarceration as a condition of bail toward any sentence imposed, if the person is found to have complied with the terms of bail.

115

2. "Generally, the sufficiency of an indictment is reviewed de novo. An indictment need only meet minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations." Syl. Pt. 2, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996).

3. "'An indictment for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based.' Syl. Pt. 3, *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983)." Syl. Pt. 1, *State v. Mullins*, 181 W.Va. 415, 383 S.E.2d 47 (1989).

4. "'An indictment is sufficient under Article III, § 14 of the West Virginia Constitution and W.Va. R.Crim. P. 7(c)(1) if it (1) states the elements of the offense charged; (2) puts a defendant on fair notice of the charge against which he or she must defend; and (3) enables a defendant to assert an acquittal or conviction in order to prevent being placed twice in jeopardy.' Syl. Pt. 6, *State v. Wallace*, 205 W.Va. 155, 517 S.E.2d 20 (1999)." Syl. Pt. 5, *State v. Haines*, 221 W.Va. 235, 654 S.E.2d 359 (2007).

*Ballard v. Dillworth*, 230 W. Va. 449, 739 S.E.2d 643 (2013). The indictment clearly violates the constitutional principles described above because there is no evidence on the record to enable the defendant to effectively assert double jeopardy. The only evidence on the record of the basis of the plea only deals with a limited number of counts, provides insufficient details to differentiate actions, and is a vague, non-specific, constitutionally-deficient summary. Specifically, the prosecutor simply recounted a single sexual encounter with L.S., then provided only the vague assertion

116

that Petitioner had sexual intercourse with J███ T. on "numerous occasions when they had lived in Mercer County," and finished with the equally vague recitation J███ T. "had been fondled by…the Defendant while…in his custody as a parent." (Ex. 12 at 37-38). The police report is not a part of the record of the criminal proceeding. There simply is insufficient evidence in the criminal proceeding that would protect the Petitioner from future prosecutions.

In sharp contrast to the case at bar, in *Dillworth*, the criminal defendant had confessed and that confession was read into the record at trial. Further, the victim testified in a manner consistent with that confession. Id. at 457, 651. Here there is very little in the record to identify the crimes to which Petitioner pled or which were dismissed pursuant to the plea.

**b. The State's Response:**

The State did not respond to this assertion.

**c. Findings of Fact and Conclusions of Law:**

(1) The Court **FINDS** that this allegation fits within the assertion that there was a defect in the indictment, namely, a failure to state the exact date and time of the commission of the crime.

(2) The Court **FINDS** that the dates and number of counts charged in the Petitioner's indictment were based upon the accounts of the child.

(3) The Court **FINDS** that in Syllabus Point 4 of *State v. Chaffin*, 156 W. Va. 264, 192 S.E.2d 728 (1972), the West

117

Virginia Supreme Court of Appeals held that "[a] variance in the pleading and the proof with regard to the time of the commission of a crime does not constitute prejudicial error where time is not of the essence of the crime charged."

(4)     The Court **FINDS** that *W. Va. Code §62-2-10*, specifically states, in pertinent part:

> No indictment of other accusation shall be quashed or deemed invalid...for omitting to state, or stating imperfectly, the time at which the offense was committed...

(5)     The Court **FINDS** that in *State ex rel. State v. Reed*, 204 W. Va. 520, 514 S.E.2d 171, (1999) the West Virginia Supreme Court of Appeals stated (while quoting *State v. Hensley*, 120 N.C. App. 313, 462 S.E.2d 500, 557 (1995)) that "[y]oung children cannot be expected to be exact regarding times and dates [;] a child's uncertainty as to the time and date upon which the offense charged was committed goes to the weight rather than to the admissibility of the evidence. Nonsuit may not be allowed on the ground that the State's evidence fails to fix any definite time for the offense where there is sufficient evidence that defendant committed each essential act of the offense."

(6)     The Court **FINDS** that additionally, *Reed* quoted *State v. Long*, 320 Or. 361 885 P.2d 696, 700 (1994) stating "[t]he state

was not required to prove that the offense was committed on the date alleged in the indictment."

(7) The Court **FINDS** that, as to the Petitioner's concerns regarding double jeopardy, that "[a] conviction under an indictment charged, through the proof was at variance regarding immaterial dates, precludes a subsequent indictment on the exact same material facts contained in the original indictment." *See generally State v. Sears,* 196 W. Va. 71, 468 S.E.2d 324 (1996).

(8) The Court **FINDS** that the West Virginia Supreme Court of Appeals has held that:

> " 'An indictment for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based.' Syl. Pt. 3, *State v. Hall,* 172 W.Va. 138, 304 S.E.2d 43 (1983)." Syl. Pt. 1, *State v. Mullins,* 181 W.Va. 415, 383 S.E.2d 47 (1989). Sy. Pt. 3, *Ballard v. Dilworth,* 230 W.Va. 449, 739 S.E. 2d 643.

(9) The Court **FINDS** that the West Virginia Supreme Court of Appeals has held that:

> " 'An indictment is sufficient under *Article III, §14 of the West Virginia Constitution* and *W. Va. R. Crim. P.* 7(c) (1) if it (1) states the elements of the offense charged; (2) puts a defendant on fair notice of the charge against which he or she must defend; and (3) enables a defendant to assert an acquittal or conviction in order to prevent being placed twice in jeopardy.' Syl. Pt. 6, *State v. Wallace,* 205 W.Va. 155, 517 S.E.2d 20 (1999)." Syl. Pt. 5, *State v. Haines,* 221 W.Va. 235, 654 S.E.2d 359 (2007). Syl. Pt. 4, *Ballard v. Dilworth,* 230 W.Va. 449, 739 S.E.2d 643.

119

(10) The Court **FINDS** that the indictment in this action substantially followed the language of the statute, fully informed the Petitioner of the accused of the particular offenses with which he was charged, and enabled him to assert an acquittal or conclusion in order to prevent being placed twice in jeopardy.

(11) The Court **FINDS** and concludes that the Petitioner's assertion that his federal and state constitutional rights were violated by the indictment is without merit.

## 5. WHETHER THE OTHER MATTERS RAISED BY THE PETITIONER IN HIS PETITIONS HAVE MERIT[6]

### a. Petitioner's Argument:

Petitioner also asserts all additional grounds raised in his *Losh* checklist and in his *Pro Se* Petition.

Petitioner also hereby asserts all grounds raised in his *Losh* checklist filed contemporaneously herewith and in his original Petition.

### b. Respondent's Response:

The State did not respond to this allegation.

### c. Findings of Fact and Conclusions of Law:

(1) The Court **FINDS** that at the omnibus habeas corpus hearing, the Petitioner testified about his claim that his trial counsel failed to appeal:

Q       Failure of counsel to take an appeal, did you

---

[6] The Court has specifically addressed the grounds of failure of counsel to take an appeal, claims of prejudicial statements by the trial judge, and question of actual guilt upon an acceptable guilty plea, in this section.

120

ask your attorney to take an appeal when you got the sentence of twenty-

five to fifty-five?

A    No, sir.

Q    Would you have wanted to take an appeal if

you'd thought one was available to you?

A    I sure would have.

(*See* Transcript of Omnibus Habeas Corpus hearing of

August 13, 2014, at p. 69, L:18 thru p. 70, L:1)

(2) The Court **FINDS** that the Petitioner also testified about his claim that the

trial judge made prejudicial statements:

Your claim of prejudicial statement by the

trial judge, did we raise that because of what the trial judge said at the time

of your sentencing about your blackout?

A    Well, I don't know what he said about it.

Q    All right. That's one I told you to raise,

isn't it?

A    Oh, yeah. That's right. You did say

something about it.

(*See* Transcript of Omnibus Habeas Corpus hearing of

August 13, 2014, at p. 72, L:15 - 23)

(3) The Court **FINDS** that the Petitioner also testified about his claim that there

was insufficient evidence to convict him:

Q    All right. The sufficiency of the evidence,

121

is that because — we raise that because of all these inconsistencies and all this evidence we brought out and that I questioned Ms. French about that we brought out in the brief?

A    Yes.

(*See* Transcript of Omnibus Habeas Corpus hearing of

August 13, 2014, at p. 73, L:1 - 6)

(4) The Court **FINDS** that the Petitioner also testified about his claim that there was a question of his actual guilt upon an acceptable guilty plea:

Q    Question of actual upon acceptance of guilty

plea, you're not guilty of this crime. Is that what you assert?

A    I'm not guilty, sir.

(*See* Transcript of Omnibus Habeas Corpus hearing of

August 13, 2014, at p. 73, L:7 - 10)

(5) The Court **FINDS** that Judge Knight enquired as to the factual basis of the Petitioner's plea during the plea colloquy:

What would the State's case be in this matter had (sic) went to trial?

MR. ASH: Your Honor, on February 20th, 2006, Ms. J███ came to the police department with her daughter, her 14 year old daughter in tow. She alleged that the Defendant had been entrusted with her daughter to take her to Hurley, Virginia to visit with. . .with uh, along with his adopted daughter.

They further stated that on the way back that they had stopped at a motel in Bluefield, West Virginia and there he had vaginal intercourse with uh,

122

with LS, which is L████S████, the daughter. Upon further inquiry the adoptive daughter, J████, also related that she'd had sexual intercourse with the Defendant on numerous occasions when they had lived in Mercer County. Those had taken place in Mercer County.

And finally upon further inquiry they had found that the son who is listed in the sexual abuse charge here, J███ T██████, age 12 had been fondled by. . .by the Defendant while in, uh, while in his custody as a parent.

THE COURT: Alright. I find the recitation by the State of what they anticipate the evidence to be if presented to the jury and the jury believed beyond a reasonable doubt would support the pleas which have been entered here by the Defendant.

I find the pleas were entered freely and voluntarily with full knowledge and understanding of the consequences of doing it. And therefore I hereby sentence him, I mean, I find him guilty of the six counts that he has entered his plea to

Are we doing anything else today?

(*See* Transcript of plea hearing of April 20, 2007, at p. 37, L:12 thru p. 38, L:21)

(6) The Court **FINDS** that the Petitioner's trial counsel had no reasonable basis on which to appeal the respondent's plea, because no grounds existed under the applicable case law upon which to base a good faith appeal, (*See State v. Sims*, in III.c.2.c.(1), *supra*.

123

(7) The Court **FINDS** that Judge Knight did not make a prejudicial statement about the Petitioner, and in fact, sentenced him on the lower end of the range of possible sentences.

(8) The Court **FINDS**, based on its review of the file, that there was sufficient evidence available to convict the Petitioner (*See* Exhibits 8 and 10 attached to the Petitioner's Memorandum in Support of the Amended Petition for Writ of Habeas Corpus, which are the police report and the toxicology report indicating the presence of semen from an item removed at one of the alleged crime scenes).

(9) The Court **FINDS** that the Petitioner has failed to prove that there was a question of his actual guilt upon an acceptable guilty plea.

(10) The Court **FINDS** and concludes that there was sufficient evidence upon which the Petitioner's plea of guilty could be substantiated.

(11) The Court **FINDS** and concludes that the Petitioner has failed to prove by a preponderance of the evidence that other grounds exist which entitles him to relief.

(12) The Court **FINDS** and concludes that the Petitioner's claim that there are other grounds raised by him in his Petitions which entitle him to relief is without merit.

## D. RULING

Wherefore, for the reasons set forth in the foregoing opinion order, the Court hereby orders and adjudges as follows:

124

1. That the Petitions for Writ of Habeas Corpus *ad Subjiciendum* are hereby denied and this action is removed from the docket of this Court.

2. The Court appoints Paul R. Cassell, Esq., to represent the Petitioner should he choose to appeal this ruling.

3. This is the final order. The Circuit Clerk is directed to distribute a certified copy of this Order to Paul R. Cassell, Esq., at his address of 340 West Monroe Street, Wytheville, Virginia, 24382; to Scott A. Ash, Esq., Prosecuting Attorney of Mercer County, West Virginia, at his address of 120 Scott Street, Suite 200, Princeton, West Virginia, 24740; and to the Petitioner, Carl T. Thompson, Sr., c/o Huttonsville Correctional Center, P.O. Box 1, Huttonsville, West Virginia, 26273.

Entered this the 2nd day of June, 2015.

**DEREK C. SWOPE, JUDGE**

THE FOREGOING IS A TRUE COPY OF A DOCUMENT
ENTERED IN THIS OFFICE ON THE 2nd DAY
OF June 20 15
DATED THIS 2nd DAY OF June
20 15

JULIE BALL, CLERK OF THE
CIRCUIT COURT OF MERCER COUNTY WV
BY _____
HER DEPUTY

125